J-S72041-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDWARD J. O'BRIEN, III | : | |
| | : | No. 2706 EDA 2016 |
| Appellant | | |

Appeal from the Judgment of Sentence August 17, 2016
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0003361-2015

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDWARD J. O'BRIEN, III | : | |
| | : | No. 2708 EDA 2016 |
| Appellant | | |

Appeal from the Judgment of Sentence August 17, 2016
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0001743-2015

BEFORE:   BENDER, P.J.E., MUSMANNO, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:          **FILED NOVEMBER 27, 2017**

Appellant Edward J. O'Brien, III, appeals from the Judgment of Sentence

entered in the Court of Common Pleas of Chester County on August 17, 2016,

following his convictions of Third-Degree Murder and Aggravated Assault[1] in

_____

[1] 18 Pa.C.S.A. § 2502(c), 2702(a)(1).

_____

\*   Former Justice specially assigned to the Superior Court.

the death of his father Edward J. O'Brien, Jr. Following a careful review, we affirm.

The trial court detailed the relevant facts and procedural history herein in its Opinion filed pursuant to Pa.R.A.P. 1925(a) as follows:

**PROCEDURAL HISTORY**

This case has a complex procedural history. On or about April 24, 2015, Appellant was charged with the following offenses:

1. Involuntary Manslaughter (18 Pa.C.S.A. §2504(a)),
2. Recklessly Endangering [A]nother Person (18 Pa.C.S.A. §2705),
3. Murder of the Third Degree (18 Pa.C.S.A. §2502(c)),
4. Theft by Unlawful Taking -Movable Property (18 Pa.C.S.A. §3921(a)), and
5. Receiving Stolen Property (18 Pa.C.S.A §3925(a))

The offenses of Murder of the Third Degree, Theft by Unlawful Taking–Movable Property, and Receiving Stolen Property were dismissed by a Magisterial District Justice after a preliminary hearing on May 11, 2015. The offenses of Involuntary Manslaughter and Recklessly Endangering another Person were held for trial and docketed at CP-15-CR-0001743-2015 in the Court of Common Pleas.

On August 3, 2015, the Commonwealth re-filed the offense of Murder of the Third Degree pursuant to Pa.R.Crim.P. 544(B) and added the offense of Aggravated Assault (18 Pa.C.S.A. §2702(a)(1)). The Commonwealth did not re-file the property offenses. The Murder and Aggravated Assault charges were held for trial after another preliminary hearing at a different Magisterial District Court on September 22, 2015. These charges were docketed in the Court of Common Pleas at CP-15-CR-0003361-2015. Appellant waived arraignment in both cases, the matters were consolidated, and scheduled for trial before this court. Prior to trial, Appellant and the Commonwealth filed multiple pretrial motions, some of which are the subject of Appellant's Concise Statement.

The first jury trial started February 16, 2016 and concluded with a mistrial due to a hung jury on February 24, 2016. Pursuant to Pa.R.Crim.P. 600, a second jury trial was scheduled to begin within 120 days, in June 2016. The jury for the second trial was

selected on June 20, 2016 and a verdict was reached on June 30, 2016. Appellant was found guilty of all charges: Murder of the Third Degree, Aggravated Assault, Involuntary Manslaughter, and Recklessly Endangering another Person.[2]

A Pre-Sentence Investigation was completed and a sentence of 5-10 years was imposed August 17, 2016 on the Murder charge. No sentence was imposed on the other offense[]. On August 23, 2016, Appellant filed a timely Notice of Appeal and we issued a Pa.R.A.P. 1925(b) Order. On November 2, 2016[3], Appellant filed a Concise Statement.

***

**FACTS**

The evidence presented at trial established the following facts: On September 8, 2013, officers responded to a 911 call at Appellant's home. Appellant had called reporting that his father had stopped breathing. Upon arriving at the home, Appellant called the officers upstairs. Officers testified that the odor of feces grew stronger the closer they came to the decedent's bedroom. In the decedent's bedroom it was over-powering. Officers found Appellant and Appellant's partner, Mr. [Samir] Rashid, in the bedroom with the body of the decedent. The decedent was clothed only in a tee shirt and appeared malnourished. There were feces on the body and very large, deep, black sores evident on several areas of the decedent's body. Dried feces were observed dripping down the side of the bed box spring, on the seat and arms of the only small chair in the room, on the nightstand next to the bed, and on the carpet. The patrol officers were concerned about the circumstances they found and called a detective to the scene for further investigation.

Through an interview with Appellant on the same day, September 8, 2013, it was determined that the decedent had been living with Appellant since May 2011. The decedent had been brought to Appellant's home by Appellant, from the Cooper River West Skilled Nursing Facility ("Cooper River") in New Jersey. Prior to Cooper River, the decedent had been hospitalized after being injured when he fell in his Collingswood, NJ home.

Through further investigation, detectives discovered that prior to being moved to Appellant's home; the decedent lived on

---

[2] In Criminal Information No. CR-3361-2015 filed on October 14, 2015, Appellant was charged with only two crimes: Murder of the Third Degree and Aggravated Assault. He was found guilty of both charges.

his own in Collingswood and had seen his physician very regularly since the 1970's. He had been prescribed various medications to treat his congestive heart failure and other conditions. While not perfectly compliant with his medication regimen, the decedent had been taking prescribed medications and seeing his doctor very regularly for many, many years. Appellant told the detective that the decedent had seen a physician only once after being moved to Appellant's home and that was in October 2011 when the decedent had complained for over an hour of chest pain and Appellant decided to do as his father was requesting, and took him to the hospital.

Appellant testified to the fact that other than the one trip to the hospital in October 2011, the decedent had left the second floor bedroom on only one other occasion during the two and a half years he lived there. The decedent had managed to get downstairs and out of the house while he was home alone in the spring of 2012. He was found by Appellant's neighbor on her porch. He was asking her to call a cab so that he could return to his own home in Collingswood, NJ.

Appellant testified that at the time he took his father from Cooper River to his home, in May 2011, Appellant had received instructions from his father's treatment providers at Cooper River that his father needed around the clock care and could not be left alone. Appellant was also given documentation and prescriptions for his father to continue his treatment for his medical conditions. In October 2011, when the decedent was taken to the Chester County Hospital's emergency room for his complaints of chest pain, the nursing records indicated that the decedent's appearance was dirty and unkempt. His groin was excoriated and there were dried feces on his buttocks; there was food in his hair. Appellant admitted to the doctor treating his father that he was having difficulty providing the care his father needed, by himself. The doctor prescribed a home health care agency to assist Appellant. The decedent was again discharged with medications and was instructed to follow up with his primary care physician. During his interview on September 8, 2013, when asked by the detective if Chester County Hospital had wanted the decedent on any medications, Appellant answered, "No."

The home health care agency recommended by the hospital doctor visited Appellant's home on one occasion for an assessment; and a treatment plan was prepared. Through testimony, it became clear that the nurses were never able to treat the decedent after that initial visit, though attempts were

made on at least five occasions to visit the decedent. Appellant did not arrange a time for them to help care for his father.

Appellant indicated that his father started deteriorating six months prior to his death; and that at about four weeks before his death, the decedent started to develop bedsores. At that point, the decedent was rarely out of the twin bed where he was propped up with pillows. There was no hospital bed, no air mattress, no comfortable chair in the decedent's bedroom. Appellant tried to treat the bedsores with soap and water, hydrogen peroxide, bandages, and Neosporin, but the incontinence his father had been experiencing continued and the sores worsened over the four weeks before his father's death.

When asked by the detective why Appellant hadn't secured medical care for his father, particularly when he saw him deteriorating the six months before his death, Appellant said, "Frankly, I figured he was 92 years old." (Comm. Exh. 30A, p. 20, ll. 29-32). When asked why he didn't take him to the doctor, Appellant said, "I don't think he really wanted to go." *Id*. at p.15, l. 28. When asked if that was a decision the decedent and Appellant discussed, he responded, "I - there wasn't really any discussion." *Id*. at p. 47, l. 42 - p. 48, l. 1. When speaking of the worsening bedsores, Appellant stated, ". . . they were of a point where, hmmm, I knew that I had to do something about it and sooner rather than later. ... I figured I really have to take him to the doctor but I hadn't decided to do that just yet because it would really be - I just hadn't decided to do that yet." *Id*. at p. 21 ll. 33-34, p. 21, l. 45 - p. 22, l. 1. On the day of his father's death, during the one hour and 10 minute interview with the detective in his dining room, when asked on several occasions about the lack of physician care and the lack of prescribed medications for his father, Appellant never indicated that his father refused medical care or medications.

_____
[3] We granted Appellant's request for leave to amend his initial Concise Statement to allow him sufficient time to review the lengthy transcripts.

Trial Court Opinion, filed 1/20/17, at 3, 6-9.

The trial court, upon noting it had sat through Appellant's trial twice and following its review of the presentence investigation (PSI) report, a psychological report, and the Commonwealth's sentencing memorandum,

decided a mitigated sentence was appropriate.  N.T Sentencing, 8/17/16, at 6.  Pursuant to the Commonwealth's recommendation, the trial court imposed a sentence of five (5) years to ten (10) years in prison on the Third-Degree Murder count alone.  Although the Commonwealth suggested it do so, the trial court did not impose a fine.  *Id*. at 2,7.

Appellant timely filed a notice of appeal on August 23, 2016.  On August 24, 2016, the trial court entered its Order pursuant to Pa.R.A.P. 1925 directing Appellant to file a concise statement of the matters complained of on appeal within twenty-one (21) days.  On September 13, 2016, Appellant filed his concise statement, and on November 1, 2016, he filed what he titled "Consolidated Concise Statement of Matters Complained of on Appeal" wherein he raised 11 issues.  On January 20, 2017, the trial court issued its sixty-six (66) page Opinion pursuant to Pa.R.A.P. 1925(a) wherein it addressed each issue Appellant had raised in his Consolidated Concise Statement.

In his brief, Appellant presents the following Statement of the Questions Involved:

> 1.    Was the evidence insufficient to prove, beyond a reasonable doubt, that [Appellant] had a duty to render medical care to his elderly father in derogation of the father's expressed opposition to further treatment?
>
> 2.    Was the evidence insufficient to prove, beyond a reasonable doubt, that any act or culpable failure to act constituting malice or disregard and indifference of an intent to cause serious bodily injury was the legal case of death or harm to the decedent?

3.      Did the trial court err, and violate [Appellant's] constitutional rights, by instructing the jury that [Appellant] bore the burden of disproving a crime?

4.      Did the trial court err in excluding evidence of various statements offered to show the decedent's opposition to nursing home and other medical care, and to show that [Appellant] did not seclude the decedent and prevent him from receiving care[?]

5.      Did the court err in excluding a prospective juror for cause when the juror said he thought police officers had an interest in the outcome of the charges that they filed, but that he would treat all witnesses [in] the same light of their respective interests?

6.      Did the court err in denying [Appellant's] motion for special order prohibiting extrajudicial prosecutorial statements without a hearing, and in entering an order precluding [Appellant] and his counsel from making extrajudicial statements, and without considering the harm occasioned by the prosecutor's comments and [Appellant's] first and sixth amendment rights to make curative public comment?

Brief for Appellant at 3 (unnecessary capitalization omitted).[3]   As Appellant's first two issues concern the sufficiency of the evidence to sustain his convictions, we will address them together.

---

[3] We note Appellant submitted an eighty (80) page principal brief and a fifteen (15) page reply brief herein.  Pursuant to Pa.R.A.P. 2135(a)(1), unless this Court or another appellate court orders otherwise, "[a] principal brief shall not exceed 14,000 words and a reply brief shall not exceed 7,000 words." Pa.R.A.P. 2135(a)(1). If a principal brief exceeds thirty (30) pages and/or a reply brief exceeds fifteen (15) pages, the appellant must certify with the appellate court that the brief complies with the word limitation. **Id**.  Appellant properly filed an "Application for Leave to Exceed Page Limitations" with this Court, and in a *Per Curiam* Order entered on August 1, 2017, we granted the same and accepted Appellant's brief filed on July 5, 2017, as compliant.

"A claim challenging the sufficiency of the evidence is a question of law."

***Commonwealth v. Widmer***, 560 Pa. 308, 319, 744 A.2d 745, 751 (2000). In considering such challenges, we are guided by a well-settled standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Further, in viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the court must give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Golphin***, 161 A.3d 1009, 1018 (Pa.Super. 2017) (citation omitted), *appeal denied*, 2017 WL 4125611 (Pa. Sept. 15, 2017).

Appellant initially argues he "could not be convicted of any offense unless the evidence established, beyond a reasonable doubt, that he engaged in an affirmative act that caused death, or failed to act when he had a duty to act." Brief for Appellant at 38. Appellant posits the Commonwealth presented

no evidence of an affirmative act on his part that caused his father serious bodily injury or death and that he had no duty to treat his father's terminal medical conditions under 18 Pa.C.S.A. § 301.[4]  *Id*.  Appellant further maintains that even if he had a duty of care under Section 301(b)(2), the evidence to support a conclusion that Appellant secluded his father and prevented him from receiving unwanted medical care is lacking.  As a result, Appellant concludes each of his convictions was unsupported by competent evidence. Brief for Appellant at 39-53.

Appellant also asserts that the evidence had been insufficient to sustain his convictions of Third Degree Murder and Aggravated Assault because "the Commonwealth failed to establish culpable malice, intent and causation beyond a reasonable doubt."  Brief for Appellant at 53. Appellant states "[e]ach charge required proof of (1) an affirmative act or breach of duty which (2) was the legal cause of death or injury accompanied by (3) the required mental state."  *Id*.  Appellant reasons that both the record and the trial court's

---

[4] 18 Pa.C.S.A.§ 301 entitled "Requirement of Voluntary Act" reads as follows:

> **(a) General rule.**—A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act of which he is physically capable.
> **(b) Omission as basis of liability.**—Liability for the commission of an offense may not be based on an omission unaccompanied by action unless:
> (1) the omission is expressly made sufficient by the law defining the offense; or
> (2) a duty to perform the omitted act is otherwise imposed by law.

- 9 -

Rule 1925(a) Opinion make clear that "the real and the only legal cause of death was the absence of medical care in the waning days of the father's life" and that "[n]o affirmative act of [Appellant] was the 'direct and substantial' cause of the death of his father." *Id*. at 54. Appellant further surmises that his "failure to treat is insufficient to constitute malice because there was no wickedness, or hardness of heart regardless of social duty." *Id*. at 55. He both asserts the evidence failed to establish he intended to cause the victim's bedsores and that any evidence the bedsores were the result of neglect was "plainly insufficient to prove the required mental state for Aggravated Assault." *Id*. at 58-59.

> Third-degree murder is defined [as] all other kinds of murder other than first degree murder or second degree murder. The elements of third-degree murder, as developed by case law, are a killing done with legal malice. Malice exists where there is a particular ill-will, and also where there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. *Commonwealth v. Marquez,* 980 A.2d 145, 148 (Pa.Super. 2009) (*en banc*) (quotations and quotation marks omitted). "Malice is established where an actor consciously disregard[s] an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *Commonwealth v. Devine,* 26 A.3d 1139, 1146 (Pa.Super. 2011) (quotation and quotation marks omitted). "Malice may be inferred by considering the totality of the circumstances." *Commonwealth v. Dunphy,* 20 A.3d 1215, 1219 (Pa.Super. 2011) (citation omitted).

*Golphin*, *supra* at 1018. In addition, "[a] person is guilty of aggravated assault if he attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S.A. § 2702(a)(1).

- 10 -

Appellant devotes a significant portion of his appellate to brief to his argument in support of the position that he had no duty to treat his father's terminal medical condition under 18 Pa.C.S.A. § 301. *See* Brief for Appellant at 39-53. The trial court also engaged in a detailed and cogent discussion supported with citations to the certified record and notes of testimony regarding Appellant's legal duty to care for his father and his efforts to seclude him from others who could have aided him which we incorporate herein by reference. The trial court further cited to record evidence that supports the jury's conclusion that Appellant's actions or failure to act was the legal cause of death and/or other harm to Appellant which we also incorporate herein by reference. *See* Trial Court Opinion, filed 1/20/17, at 17-23, 29-57. The trial court determined that an affirmative act is not required by the Criminal Code when, as was the case herein, there is an omission or failure to act relative to a legal duty. *Id.*, at 17. *See also Commonwealth v. Pestinikas*, 617 A.2d 1339, 1345 (Pa.Super. 1992) (stating the appellant's culpable behavior consisted of an affirmative course of conduct calculated to deprive the decedent of the food and medical care which was otherwise available to him and which was essential to continued life as well as efforts to place the decedent beyond the ability of others to provide such needs).

Even assuming, *arguendo*, that Appellant did not have a legal duty to render medical care to his elderly father under 18 Pa.C.S.A. § 301 and accepting his argument that it was not his conscious purpose to bring about

the death of his father, the record evidence shows Appellant failed to perceive that his actions might create a substantial and unjustifiable risk of death or serious bodily injury to his father regardless of any duty he might have owed to him.

Appellant was charged with Third Degree Murder and Aggravated Assault, and as is readily apparent from the aforesaid definitions of those crimes, neither requires proof of a duty of care. Moreover, the Commonwealth was not required to prove Appellant deliberately intended to harm his father as part of its proof that he acted with legal malice. *Commonwealth v. Dunphy*, 20 A.3d 1215, 1219 (Pa.Super. 2011). Third-Degree Murder is a killing done with legal malice, and malice does not exist only where one's omission or failure to perform a legal duty was willful and likely to result in the death of a victim. Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury. *Id*. *See also*, *Commonwealth v. Miller*, 627 A.2d 741 744 (Pa.Super. 2003).

Dr. Ian Hood, a forensic pathologist who performed autopsies for nearly fifteen years for the Chester County Coroner as the Deputy and Chief Medical Examiner in Philadelphia, remarked that the decedent's body was "in a pretty dirty condition," besmirched with a "[l]ot of feces and urine head to toe." N.T. Trial, 6/24/16, at 911. He estimated the decedent was "no more than a hundred thirty pounds," though he was five foot eleven inches tall. *Id*. at

927. Dr. Hood also noticed "several large decubiti covered with black eschar" which he opined the decedent had begun to develop "three to four weeks before" and which became "worse over time." *Id*. Most of these painful sores were stage three, meaning they had penetrated the dermis into the subcutaneous tissue. *Id*. at 924-25, 929. If the decedent had received "a modicum of reasonably good quality care, regular care, washing, changing bed clothes, his own clothing, proper toileting should have done real well. Should not have developed decubiti" which had caused him to become septic. *Id*. at 912. The decedent's lungs were filled with fluid, a condition called "pulmonary edema," which is typical in those suffering from heart failure. *Id*. at 918-19. Dr. Hood found the cause of death to be congestive heart failure contributed to by infected decubiti. *Id*. at 922.

Appellant's own testimony established he had been named his father's medical representative on May 19, 1998. The Commonwealth presented the Advanced Directive which set forth the procedure to be followed to safeguard the decedent's well-being prior to a determination as to whether heroic measures would be taken to save his life. N.T. Trial, 6/28/16, at 1195-96. Appellant also admitted he served as his father's power of attorney and primary caregiver. *Id*. at 1240, 1252. Appellant knew his father had been without medical treatment or prescribed medication for an extended period of time while in his care, although he also was aware that when his father came to live with him in May of 2011, he had been taking Lasix or Furosemide to

treat his congestive heart failure. *Id*. at 1229, 1235. Nevertheless, Appellant did not get the Lasix prescription refilled as his father had requested in November of 2011. *Id*. at 1238, 1243.

Appellant acknowledged that in the weeks prior to his father's death he noticed the latter suffered from bedsores and chronic diarrhea. N.T. 6/28/16, at 1172, 1175. Appellant also admitted that in the roughly two years his father resided with him, his father left the home only twice, once to go to Chester County Hospital and the other when he tried to get away. *Id*. at 1281. During that period of time, the decedent communicated with only Appellant and Mr. Rashid. *Id*. at 1283.

Following a careful review of the complete record, the parties' arguments and the applicable law, we agree with the trial court's reasoning and find no abuse of discretion in its finding that the Commonwealth presented ample and sufficient evidence for the jury to convict him of Third-Degree Murder and Aggravated Assault beyond a reasonable doubt. Such record evidence when viewed in a light most favorable to the Commonwealth as verdict winner, together with all inferences, established that Appellant either knew or recklessly disregarded the fact that his father was in need of medical attention for over two years, and especially in the weeks immediately preceding his death. Despite his awareness of these facts, Appellant failed to take steps to procure appropriate care for his father and in doing so consciously disregarded the extremely high risk his continued failure to ensure

his father received appropriate medical attention might cause him death or serious bodily injury and that Appellant's malicious course of conduct caused Appellant's death. ***See Commonwealth v. Kellam***, 719 A.2d 792, 797 (Pa.Super. 1998).

In his third claim, Appellant argues the trial court erred and violated his constitutional rights in instructing the jury*, sua sponte*, that he bore the burden of disproving a crime and of proving that he had no duty to act based on the victim's decision to forego treatment.[5] Specifically, Appellant refers to the following instruction:

> As I have just instructed you throughout the trial, the Commonwealth bears the burden of proving every element of each charge beyond a reasonable doubt. The defendant does not bear any burden to disprove any element of the crimes charged.
>
> In this case the defendant has asserted what is called an affirmative defense claiming his conduct was a result of the decedent's wishes to forego medical care. The defendant bears the burden of proving, proving to you by a preponderance of the evidence, that his conduct was due to decedent's wishes to forego medical care.
>
> Let me explain the difference between the burdens of proof. While the Commonwealth's burden in relation to each element of each charge is beyond a reasonable doubt, the defendant's burden relating to his affirmative defense is a lesser burden. That burden is a preponderance of the evidence, which means that the fact asserted is more likely true than not.
>
> It is the law in the Commonwealth of Pennsylvania that a rational, competent person has a right to refuse medical treatment and they have a right to refuse it for any reason whatsoever. If you find based on the evidence presented that it is more likely

---

[5] Pa.R.E. 103 addresses rulings on evidence and requires a contemporaneous objection in order to preserve a claim of error in the admission of evidence. Appellant placed timely and specific objections to the instruction on the record. N.T. Trial, 6/24/16, at 996-97; 6/29/16, at 1550.

than not that Edward J. O'Brien, Jr. made a rational and competent refusal of medical care, you must find the defendant not guilty.

Brief of Appellant at 61 (citing N.T. Trial, 6/29/16, at 1529-1530).

This Court recently reiterated our standard of review of a trial court's jury instruction as follows:

> "When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper." *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014) (citations and quotation omitted). A trial court has "broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Id.* (citations and quotation omitted). "Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error." *Id.* (citations and quotation omitted).
>
> "The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal." *Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013).

*Commonwealth v. Miller*, 2017 WL 4639576 at *8 (Pa.Super. Oct. 17, 2017).

In addressing this issue in its Rule 1925(a) Opinion, the trial court reasoned as follows:

### A. Affirmative Defense Instruction Appropriate

> We first examine Appellant's claim that it was error to assign the burden of proof for an affirmative defense to Appellant at all because it relieved the Commonwealth of its burden to prove all the elements of the crimes charged beyond a reasonable doubt. We disagree. The jury was repeatedly instructed, in the general instructions and as the instruction for each crime was given, that the Commonwealth bore the burden of proving every element of

- 16 -

each crime beyond a reasonable doubt. They were also repeatedly instructed that the Appellant bore no burden with respect to the crimes charged. (N.T., 06/29/16, Vol. VIII, p. 1528, ll. 4-12, p. 1529, ll. 10-13, 17-21). It was made clear that if they found the Commonwealth failed to meet its burden of proof on any element of any of the charges that they should find Appellant not guilty. (N.T., 06/29/16, Vol. VIII, p. 1528, ll. 13-14, p. 1539, II. 10-13).

The appellate courts have consistently held that the burden of proving an affirmative defense that relieves the accused of criminal responsibility, but does not negate an element of the offense charged, may be placed on the defendant. *See* Pa.S.S.J.I.(Crim.), §2.10, (2016) Defenses -Assigning the Burden of Proof, Advisory Committee Note, *citing Commonwealth v. Collins*, 810 A.2d 698, 701, (Pa.Super. 2002); *Commonwealth v. Shenkin*, 487 A.2d 380 (Pa.Super. 1985). The general rule is that when the asserted defense may only be proven by "information that is peculiarly within the defendant's own knowledge and control, the ... defendant has the burden of proving the defense by a preponderance of the evidence. *See Commonwealth v. Rishel*, 658 A.2d 352, 355 (Pa.Super. 1995), *reversed on other grounds* 681 A.2d 162 (Pa.1996). Appellant testified at length about the decedent's communication of his wishes to Appellant. According to the testimony presented by Appellant and other defense witnesses, the decedent wished to remain in Appellant's home, did not want to be in a skilled nursing facility, and did not wish to receive medical care from visiting nurses whom he considered strangers. These conversations occurred between Appellant and the decedent. Some occurred in the presence of Appellant's partner, Mr. Rashid who also testified. (N.T., 06/27/16, Vol. VI, p. 1104, l. 23 - p. 1105, l. 16; p. 1108, ll. 23-25; N.T. 06/28/16, Vol. VII, p. 1252, l. 9-16; N.T., 06/29/16, Vol. VIII, p. 1365, l. 12 - p. 1366, l. 19).

Appellant's defense included the proposition that Appellant failed to get medical care for the decedent because the decedent refused any care. Obviously, the Commonwealth had no access to any evidence relating to the decedent's wishes other than statements made by Appellant and the decedent's past medical history demonstrating the care he sought for himself. We found, and continue to find, that it was appropriate to give the jury an affirmative defense instruction.

Our instructions clearly and repeatedly stated that the Commonwealth maintained its burden to prove all of the elements of each crime beyond a reasonable doubt. In determining whether they believed the decedent refused medical care, thereby relieving

Appellant of his legal duty to care for the decedent, the jurors made a credibility determination after hearing the recording of Appellant's interview with Detective Lund, and after hearing Appellant and other witnesses testify in court. The jury had only to find that it was more likely than not that there was a competent refusal of care by the decedent in order to return a verdict of not guilty on all counts. But, it was also made clear to the jurors that the Commonwealth maintained the burden of proof, beyond a reasonable doubt, in reference to all the elements of the crimes. Consequently, we find no error was made.

B. Affirmative Defense Instruction Given in this Case

We next examine whether the specific instruction relating to the affirmative defense given in this case was appropriate. Our jury instructions did not place a burden on Appellant to show that he had "no duty." First and foremost, we instructed the jury that it was initially the Commonwealth's burden to prove beyond a reasonable doubt that Appellant had a legal duty to provide medical care to the decedent. We stated:

> COURT: You cannot find the [Appellant] guilty ... based solely on failure to act **unless you are satisfied beyond a reasonable doubt that the defendant had a legal duty to care for the decedent**....

(N.T., 06/29/16, Vol. VIII, p. 1542, ll. 8-13) (emphasis added). The burden of proving, beyond a reasonable doubt, that Appellant had a legal duty to care for his father was assigned to the Commonwealth. This same instruction was given on every criminal charge: Murder in the Third Degree, *Id*., Involuntary Manslaughter, *see* N.T., 06/29/16, Vol. VIII, p. 1542, l. 22 - p. 1543, l. 13), Aggravated Assault, *see* N.T., 06/29/16, Vol. VIII, p. 1545, l. 24 - p. 1546, l. 17), and Recklessly Endangering Another Person, *see* N.T., 06/29/16, Vol. VIII, p. 1548, ll. 1-5, 11-16).

We also gave an additional instruction related specifically to the lesser burden being placed upon Appellant regarding his affirmative defense which required them to make a finding of fact, by a preponderance of the evidence, relating to the decedent's wishes to forgo medical care. We found that the facts in this case and the facts contemplated by the statute relating to Neglect of Care -Dependent Person, 18 Pa.C.S.A. § 2713 are very similar. Accordingly, we used the suggested standard instruction governing Neglect of Care -Dependent Person, *Id*., as a template for our instruction. Specifically, we used the portion of the Neglect of Care -Dependent Person that sets forth the affirmative defense.

- 18 -

Pa.S.S.J.I. (Crim), §15.2713 (2016)(Neglect of Care -Dependent Person). The §15.2713 affirmative defense instruction states:

> The defendant has asserted that the conduct otherwise charged in this case resulted directly from:
>
> a. ... compliance with a care -dependent person's living will for health care ...; or
>
> b. ... compliance with the care -dependent person's written, signed, and witnessed instructions, executed when the care -dependent person was competent as to the treatment he or she wished to receive; or
>
> c. compliance with the direction of the care - dependent person's ... power of attorney ... within the scope of that power; or
>
> d. compliance with a [DNR] order ... by ... attending physician; ...

The defendant bears the burden of proving to you by a preponderance of the evidence that the conduct resulted from one of these circumstances. If you find that the defendant has shown you that it is more likely than not that such circumstances did exist and did result in the conduct charged, you should find the defendant not guilty. Otherwise, if all of the elements as I have explained them have been proven beyond a reasonable doubt, you should find the defendant guilty.

We gave the following instructions:

> COURT: In this case the defendant has asserted what is called an affirmative defense claiming his conduct was a result of the decedent's wishes to forgo medical care. The defendant bears the burden of proving, proving to you by a preponderance of the evidence, that his conduct was due to decedent's wishes to forego medical care.
>
> Let me explain the difference between the burdens of proof. While the Commonwealth's burden in relation to each element of each charge is beyond a reasonable doubt, the defendant's burden relating to his affirmative defense is a lesser burden. That burden is a preponderance of the evidence, which means that the fact asserted is more likely true than not.

(N.T., 06/26/16, Vol. VIII, p. 1529, l. 22 - p. [1530, l. 9).

At Appellant's request, the jury was further instructed:

> It is the law in the Commonwealth of Pennsylvania that a rational, competent person has a right to refuse medical treatment and they have a right to refuse it for any reason whatsoever. If you find based on the evidence presented that it is more likely than not that

the decedent made a rational and competent refusal of
medical care, you must find the defendant not guilty.
(N.T., 06/26/16, Vol. VIII, p. 1530, ll. 10-16).

COURT: [I]f you find by a preponderance of the
evidence that it is more likely than not that the decedent
made a competent, rational refusal of medical care, you
may not find the defendant had a duty to care for the
decedent.

*See* N.T., 06/29/16, Vol. VIII, p. 1541, ll. 4-7 (Third Degree
Murder), p. 1543, ll. 2-6 (Involuntary Manslaughter), p. 1546, I.
5-9 (Aggravated Assault), and p. 1548, ll. 6-10 (Recklessly
Endangering Another Person). We concluded that the instructions
provided to the jury were necessary for them to understand the
legal principles to be applied in the case given the evidence
presented.

In order to aid the jury in their understanding of the law
they were to consider, the instructions were displayed on a large
screen so that they were able to read along as they listened to the
court read the instructions. Additionally, each juror was provided
with a copy of the instructions for each of the offenses and the
affirmative defense instruction to use for reference during their
deliberations. After review of the entire jury instruction as
reflected in the Notes of Testimony we continue to find our
instructions were appropriate and find there was no error in giving
the affirmative defense instruction in the manner in which it was
given.[16]

_____

[16] It should be noted that of the few questions asked by the jury
during their approximately 10 hours of deliberations, none
indicated there was any confusion relating to the differences
between the burdens of proof they were to apply when making
the finding of fact relating to the decedent's wishes, versus the
finding of fact they were required to make relating to Appellant's
legal duty to care for his father.

Trial Court Opinion, filed 1/20/17, 58-64. (emphasis in original).

Our review of the record supports the trial court's assessment. Contrary

to Appellant's characterization of the aforementioned instruction as informing

the jury that he bore the burden of "disproving a crime," the trial court

repeatedly stressed that the Commonwealth had to prove each and every

element of all charged crimes beyond a reasonable doubt, and it specifically stated "[Appellant] does not bear any burden to disprove any element of the crimes charged." N.T. Trial, 6/29/16, at 1529; *see also*, N.T. Trial, 6/21/16, at 176-77. The trial court simply clarified that Appellant may establish his defense that his inaction was the result of his father's wishes by a preponderance of the evidence, in which case the jury must find him not guilty. In doing so, the trial court did not impose upon Appellant a burden to disprove duty, but rather stated that if the jury believed Appellant's inaction arose out of the decedent's specific wishes it could not find Appellant had a duty to care for him or convict him of any crime. Thus, we discern no abuse of the trial court's discretion.

Appellant next avers the trial court erred in excluding the testimonial evidence of Mr. Samir Rashid. Specifically, Appellant maintains "[t]he statements made by [Appellant] to Samir Rashid regarding the father's medical care, and the statements made by [Appellant] to the father in Rashid's presence, encouraging the father to seek medical care, were improperly excluded. *See* NT 1360-1361, 1362a-1363a." Brief for Appellant at 65. Appellant posits Mr. Rashid's proposed testimony constituted non-hearsay evidence in the form of "verbal acts" pertaining to Appellant's plan or state of mind and would have shown the decedent was opposed to residing in a nursing home and to receiving other medical care as well as that Appellant did not seclude him or prevent him from receiving such care. Brief for Appellant at

64-65. In addition, Appellant claims statements he made to his neighbor Marie Henry were excluded improperly as hearsay because they were offered as both non-hearsay evidence of his plan and state of mind and as verbal acts of non-seclusion. Brief for Appellant at 66. Appellant posits such statements were "manifestly relevant" herein, especially in light of the fact that this was Appellant's second trial following a hung jury, and in the first trial the jury was unable to reach a verdict on the same charges of which he was convicted herein.

Our standard of review in this regard is well-settled.

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Tyson*, 119 A.3d 353, 357–58 (Pa.Super. 2015) (*en banc*), *appeal denied*, 128 A.3d 220 (Pa. 2015) (quotation marks and citations omitted).

In his Consolidated Concise Statement of Matters Complained of on Appeal, Appellant set forth the following errors:

* * *

> 8. The court erred in excluding evidence of various statements of the decedent, and statements made by [Appellant] to the decedent, offered to show decedent's desires regarding medical treatment.
> 9. The [c]ourt erred in excluding statements made by [Appellant] to his neighbor Marie Henry regarding the decedent's

condition and treatment offered, inter alia, on the issue of whether [Appellant] secluded his father and prevented him from securing treatment, and as prior consonant statements after Appellant was cross-examined on the efforts to secure and provide treatment.

* * *

**See** Defendant's Consolidated Concise Statement of Matters Complained of on Appeal, filed 11/1/16, at ¶¶ 8-9.

Appellant's allegation set forth in paragraph eight of his Consolidated Concise Statement is vague, and he clearly did not present a specific challenge to the trial court's ruling pertaining to Mr. Rashid's proposed testimony either therein or in paragraph nine. This vagary is reflected in the trial court's confusion "as to which of the decedent's statements Appellant argues were erroneously excluded from evidence." **See** Trial Court Opinion, filed 1/20/17, at 23 (citing Defendant's Concise Statement of Matters Complained of on Appeal, filed 11/1/16, at ¶¶ 2, 8).[6] It is well-settled that "when the trial court directs an appellant to file a [Rule 1925(b)] statement, any issues that are not raised in [that] statement will be waived for appellate review." **Commonwealth v. Smith**, 955 A.2d 391, 393 (Pa.Super. 2008). Further, "when issues are too vague for the trial court to identify and address, that is

---

[6] Notwithstanding, the trial court reasoned that even if it abused its discretion in making evidentiary determinations in this regard, its decision would constitute harmless error because Appellant was able to establish the points he wished to make to the jury through his own testimony about conversations he had had with decedent and the "exhausting number of medical records" admitted into evidence that showed the decedent's lapses in taking his medication. Trial Court Opinion, filed 1/20/17, at 24.

the functional equivalent of no concise statement at all." *Id.* In addition, "[a] theory of error different from that presented to the trial jurist is waived on appeal, even if both theories support the same basic allegation of error which gives rise to the claim for relief." *Commonwealth v. Ryan*, 909 A.2d 839, 845 (Pa.Super. 2006) (citation omitted). Because only claims properly presented before the trial court are preserved for appeal, Appellant's contentions in his appellate brief concerning the trial court's rulings regarding Mr. Rashid's testimony are waived.

Appellant devotes approximately one page of argument in his appellate brief to his contention that certain statements he had made to Ms. Henry were improperly excluded as hearsay. However, upon our review of the record, we find it lacks merit. Ms. Henry testified she knew Appellant through her involvement in the Hollyview Lane's homeowner's association board. During the time the decedent lived with Appellant, Ms. Henry had occasion to speak with Appellant routinely about his father's medical condition. N.T. Trial, 6/29/16, at 1338, 1342. The Commonwealth objected when Ms. Henry attempted to reveal the contents of those conversations on the basis that such information constituted inadmissible hearsay offered for the truth of the matter asserted. *Id*. at 1339-41. During a sidebar discussion, the trial court stated Appellant could elicit testimony regarding the fact Ms. Henry knew the decedent lived with Appellant and that Appellant spoke about the decedent "for purposes of getting to the issue regarding seclusion," but it found the

specific content of any conversation was being offered for the truth of the matter asserted and, therefore, constituted inadmissible hearsay. *Id*. at 1341.

On cross-examination, Ms. Henry clarified that during the two years Appellant's father lived in Appellant's home, she never actually saw him, visited the home, or spoke to any medical personnel about the decedent's medical condition. Any information she had in this regard originated from Appellant. *Id*. at 1343. Therefore, even were the trial court to have permitted Ms. Henry to testify concerning Appellant's "plan and efforts to encourage the decedent to secure medical care," such testimony would not have been "manifestly relevant," as Appellant argues but rather merely would have reiterated what Appellant told her. Thus, we find no error in the trial court's holding that responses to Appellant's further questioning concerning the substance of Ms. Henry's conversations with him would constitute inadmissible hearsay. As the trial court stated, Appellant presented his own testimony concerning conversations he had had with his father about the latter's medical treatment, and Ms. Henry's testimony as it stood was relevant to rebut the Commonwealth's allegations of Appellant's seclusion of the decedent in that it established Ms. Henry was aware the decedent lived with Appellant and that he had medical problems which Appellant readily discussed with her.

Appellant's fifth issue alleges trial court error in excluding a prospective juror for cause at the Commonwealth's request and over Appellant's objection. Initially, we note that

> [a] criminal defendant's right to an impartial jury is explicitly guaranteed by Article I, section 9 of the Pennsylvania Constitution. The jury selection process is crucial to the preservation of that right.... It must be remembered the purpose of the *voir dire* examination is to provide an opportunity to counsel to assess the qualifications of prospective jurors to serve. It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. Thus the inquiry must be directed at ascertaining whether the venire person is competent and capable of rendering a fair, impartial, and unbiased verdict. The law also recognizes that prospective jurors were not cultivated in hermetically sealed environments free of all beliefs, conceptions and views. The question relevant to a determination of qualification is whether any biases or prejudices can be put aside upon the proper instruction of the court.
>
> A challenge for cause to service by a prospective juror should be sustained and that juror excused where that juror demonstrates through his conduct and answers a likelihood of prejudice. The decision whether to disqualify a venireman is within the discretion of the trial court and will not be disturbed on appeal absent a palpable abuse of that discretion. Stated another way, the test of disqualification is the juror's ability and willingness to eliminate the influence of his scruples and render a verdict according to the evidence. This determination is to be made by the trial judge based on the juror's answers and demeanor and will not be reversed absent a palpable abuse of discretion.

*Commonwealth v. Penn,* 132 A.3d 498, 502 (Pa.Super. 2016) (footnote, citations, quotation marks, and quotations omitted). In *Penn*, a prospective juror initially expressed that she would be more likely to believe a police officer than other testifying witnesses do to her personal employment history in law enforcement but later stated she could decide the case based upon the evidence presented during trial. *Id*. at 500-01. Nevertheless, the trial court

denied the appellant's challenge to excuse the prospective juror for cause, and this Court ultimately vacated the appellant's judgment of sentence and remanded for a new trial after finding the juror had expressed an actual bias.

In the matter *sub judice*, when questioned by the prosecutor during *voir dire*, Prospective Juror Number 80 (hereinafter "Juror No. 80") indicated he would be more likely to disbelieve a police officer because as one in a position of power, an officer "automatically [has] a conflict of interest." N.T. Trial, 6/20/16, at 158. In an effort to discern Juror No. 80's reasoning, the prosecutor questioned him further as follows:

> PROSECUTOR: Just so I understand this, I do understand that one has a view that police officers should be held to a higher standard.
>
> JUROR NO. 80: Yes.
>
> PROSECUTOR: But it doesn't necessarily follow that they would be more likely not to be truthful or does it to you?
>
> JUROR NO. 80: Well, to me depends on the situation. So if it was a situation where there didn't seem to be any conflict of interest, for instance, like where they had any potential wrongdoing in a way they went through procedures, things like that, then they would be -- I would have no reason to second guess their testimony.
>
> PROSECUTOR: If I'm misstating this I'm sure I will be corrected. But I do believe that standard is that a police officer is to be viewed from the standpoint of whether or not you or another juror believes or disbelieves the officer based on the same standards as any other witness.
>
> JUROR NO. 80: I understand that. But not every witness has that role as a police officer.
>
> PROSECUTOR: I understand that. So the question--

- 27 -

JUROR NO. 80: It's a role based assessment.

PROSECUTOR: So I understand what your view is. The question I have is whether or not notwithstanding your personal views on this that you will be able to put them aside, say I'm going to treat a police officer just like anyone else in terms of deciding whether or not I believe or disbelieve him or her?

JUROR NO. 80: Right, yes, so any other citizen besides a police officer could have a similar conflict of interest that I would have to assess in the same way.

PROSECUTOR: I guess the question is whether you can assure us if you were a juror would you would treat a police officer just like anyone else in terms of deciding whether or not he or she is credible or not?

JUROR NO. 80: Their role as a police officer is a consideration, yes.

PROSECUTOR: I'm not sure I understand your qualification.

JUROR NO. 80: Well, basically you have certain interests as a police officer that you wouldn't have if you were not a police officer. That's the distinction.

PROSECUTOR: Okay. Thank you.

THE COURT: All right. Thank you so much.

N.T. Trial, 6/20/16, at 159-160.

Following the aforementioned exchange, the prosecutor moved to excuse Juror No. 80. In doing so, the prosecutor indicated that, to him, it seemed rather clear that the prospective juror held "police to higher standards in terms of credibility assessment." *Id*. at 162. He also stated it appeared Juror No. 80 was predisposed to believe "that police have a conflict of interest, that he will treat them or assess their credibility with a standard that is higher

than what it should be." **Id**. The prosecutor explained he formed his opinion because no matter how he phrased the questions, he always received "the same answer." **Id**. Appellant opposed the motion to strike for cause and argued that Juror No. 80 did not say that he would "automatically disbelieve a police officer," but did state he would "assess the interest of all witnesses." **Id**. Notwithstanding, the trial court stated it "agree[d] with [the prosecutor's] assessment and [the] fact he is not going to change his position police officers somehow have something more at stake than other witnesses. So I will dismiss him for cause." **Id.**

In its Rule 1925(a) Opinion, the trial court explained its decision to grant the Commonwealth's motion to strike the juror as follows:

> Juror No. 80 did not give a complete answer. The trial court determined that Juror 80 would most likely not be able to put aside his belief that a police officer would lie if the officer believed lying would help secure a conviction. We found his manner and speech pattern to be hesitant and conflicted. It was clear to this jurist that Juror No. 80 could not give a clear assurance that he would be able to put aside his prejudice and bias against a police officer's self-interests until he heard the facts of the case, and at that point, it would be too late to impanel a fair jury. We do not find it was an abuse of discretion to strike Juror No. 80 over Appellant's objection.

Trial Court Opinion, filed 1/20/17, at 17.

This Court recently reiterated "it is well-settled that a party must make a timely and specific objection at trial, and the failure to do so results in waiver of that issue on appeal. Pa.R.A.P. 302(a); **see also Commonwealth v. Montalvo**, 1641 A.2d 1176, 1184 (Pa.Super. 1994) (citation omitted) (to

preserve an issue for review, a party must make a timely and specific objection at trial, for this Court will not consider claim on appeal not called to trial court's attention at a time purported error could have been corrected)." *Commonwealth v. McGriff*, 160 A.3d 863, 866 (Pa.Super. 2017), *reargument denied*, June 20, 2017. Appellant did not object on any basis following the trial court's decision to dismiss Juror No. 80 for cause. As a result, he failed to properly preserve this challenge on appeal.

Even had Appellant properly preserved this claim, he presents no argument as to how the trial court's striking Juror No. 80 for cause resulted in the assemblage of an impartial jury or otherwise prejudiced him. To the contrary, the prosecutor moved to strike the prospective juror, and the trial court granted the motion, so that he would not give additional credence to the testimony of a police offer. This action certainly benefitted Appellant, for the Commonwealth presented the testimony of Detectives Michael J. Buchmann and Jeffrey McCloskey, of the West Whiteland Township Police Department. N.T. Trial, 6/21/16, at 235-63; N.T. Trial, 6/24/16, at 846-81. Kristin Lund, who worked with the Chester County Detectives, a branch of the District Attorney's Office, also testified for the Commonwealth. N.T. Trial, 6/24/16, at 882-95; N.T. Trial 6/27/16, at 1003-77. In light of the foregoing, we find the trial court, who heard the juror's answers and observed his demeanor, did not palpably abuse its discretion in granting the Commonwealth's motion to strike Prospective Juror Number 80 for cause.

Lastly, Appellant challenges the trial court's Order entered on May 1, 2015, pertaining to his "Motion for Special Order Prohibiting Extrajudicial Prosecutorial Statements" which stated the following:

> AND NOW, this 1st day of May, 2015, upon consideration of [Appellant's] Motion for Special Order Prohibiting Extrajudicial Statements pursuant to Pa.R.Crim.P. 110,[7] the Commonwealth's Response to Motion for Special Order, and finding that a hearing is not necessary, it is hereby ORDERED:
>
> 1. Counsel for [Appellant] and counsel for the Commonwealth are precluded from public comment about this case except in accordance with Rule 3.6 of the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania. A copy of Rule 3.6 is attached hereto as Exhibit "A."
>
> 2. All persons assisting or associated with counsel for the Commonwealth are precluded from making extrajudicial statements that counsel for the Commonwealth would be prohibit[ed] from making under Rule 3.6 of the Rules of Professional Conduct.

---

[7] Pa.R.Crim.P. 110 entitled "Special Orders Governing Widely-Publicized or Sensational Cases" provides:

> In a widely-publicized or sensational case, the court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury, the seating and conduct in the courtroom of spectators and news media representatives, the management and sequestration of jurors and witnesses, and any other matters that the court may deem appropriate for inclusion in such an order. In such cases, it may be appropriate for the court to consult with representatives of the news media concerning the issuance of such a special order.

Pa.R.Crim.P. 110.

3. Law enforcement and court personnel shall not make extrajudicial statements relating to his case or issues therein.

4. Counsel for the Commonwealth and counsel for [Appellant] shall caution parties and witnesses with respect to the possible consequences of extrajudicial statements made during the course of trial and jury selection.

5. Counsel for the Commonwealth and counsel for [Appellant] shall promptly make all appropriate persons assisting of associated with the prosecution or defense of this case aware of this Order.

Trial Court Order, filed 5/1/15, at ¶¶ 1-5.

Appellant claims that in issuing the Order without first holding a hearing, the trial court deprived him of his right to respond to statements the Chester County District Attorney Thomas Hogan had made in both a press release and a news conference on April 29, 2015. He further contends the fact that the Order affected the Commonwealth and him alike is "wholly inappropriate," for "defense counsel should be free to tell the truth about these charges to new media interested in listening" without any concern that he would be sanctioned under Rule 3.6. Brief for Appellant at 74. Appellant asserts Mr. Hogan "has elevated increasing public condemnation and opprobrium to a calculated art-form" and proceeds to highlight statements Mr. Hogan allegedly made in other high profile cases. *Id*. at 76-79.

The trial court stated its reasons for entering the Special Order herein as follows:

There is little guidance as to the standard of review when addressing a court's order limiting extrajudicial statements by counsel. It has been previously determined that court imposed "limitations on the speech of attorneys involved in pending litigation, even when such limitations are prior restraints on the attorney's First Amendment rights, will be constitutional if the prohibited speech is limited to that which contains a substantial likelihood of material prejudice to an adjudicatory proceeding." *Commonwealth v. Lambert*, 723 A.2d 684, 686 (Pa.Super. 1998). It is also appropriate to limit speech when the limitation "does not constrain the access to or the publication of a trial's events, testimony, or evidence." *Id*. When these guidelines are met, the limitation on speech has been found to be constitutionally acceptable.

Appellant filed a Motion for Special Order Prohibiting Extrajudicial Prosecutorial Statements on April 30, 2015. In his Motion, Appellant averred that:

Thomas P. Hogan, Esquire, acting as District Attorney of Chester County, undertook a calculated campaign of extrajudicial statements designed and intended to unfairly prejudice [Appellant]... . [He] caused his assistant ... to issue a Press Release to local outlets[] [t]hat ... included numerous false and misleading statements, calculated to impair the [Appellant's] right to a fair and impartial trial, which had ... a substantial likelihood of increasing public opprobrium of the accused. For example, the statement includes ...

'This was no way for any person to die. If somebody treated an animal so shamefully, everybody would be horrified. The fact that it happened to an elderly man, and was caused by the man's own son, is inexcusable.'

(*See* Appellant's Motion for Special Order, 04/30/15). The Chester County District Attorney, Thomas P. Hogan, also made the following references:

This was a death without dignity....

[The decedent] was put in a back bedroom to rot....

[W]hat we often see in these cases is the parent is just not dying fast enough, so somebody starts taking money, and not caring for their parents. *Id*.

- 33 -

One of the headlines stated "Son Left Dad to Rot." (NBC News 10, Alison Burdo, 04/2015). Appellant's counsel responded to the above statements in the press and his client's position was also reported by the media, including his opinion that Mr. Hogan was effectuating "trial by press release." (Chadds Ford Live, Kathleen Brady Shea, 04/29/15). Appellant requested that the court issue an order limiting extrajudicial statements by the Commonwealth as authorized by Pa.R.Crim.P. 110, and we did. We found there was no need for a hearing as the facts averred by Appellant's counsel were readily available for the court to review in the local paper and news outlets. We found that Mr. Hogan's statements had a substantial likelihood of heightening public condemnation for Appellant.[4] (Pa.R.P.C. 3.8, Special Responsibilities of a Prosecutor).

Appellant's objection to the Order is that it applied to the defense as well as the prosecution. Appellant now argues that he and his counsel were deprived of their First Amendment right to free speech by the court's May 1, 2015 Order. The Order stated in part:

Counsel for [Appellant] and counsel for the Commonwealth are precluded from public comment about this case except in accordance with Rule 3.6 of the Rules of Professional Conduct.

Rule 3.6 of the Pennsylvania Rules of Professional Conduct ("Rule 3.6") sets forth the limits of extrajudicial comments related to trial publicity. All counsel are bound by the ethical mandates of Rule 3.6. We found it necessary to remind counsel of their ethical obligations. We did not preclude Appellant nor his counsel from exercising their right to free speech. Defense counsel was free to respond to any comments he felt necessary to protect his client from undue prejudice, so long as those comments did not violate Rule 3.6.

Additionally, paragraph 4 of the Order stated that counsel should advise the parties and witnesses about the possible consequences of making extrajudicial statements during the course of trial and jury selection. This paragraph reminded counsel and the parties that extrajudicial statements have real consequences, i.e. the delay of trial proceedings and extended jury selection due to media coverage of extrajudicial statements prejudicing the general jury pool, influencing the opinions and recollections of witnesses, etc. A determination to see if there was improper intrusion into Appellant's and his counsel's free speech rights must be made using the entire record. *Commonwealth v.*

*Lambert*, 723 A.2d 684 (Pa.Super. 1998), citing *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038 (1991).

At the time the Order was issued, the court was fully aware that the relationship between Appellant's defense counsel and the Chester County District Attorney's Office, specifically District Attorney Thomas Hogan, was markedly hostile. Therefore, we structured our Order in a manner that would not restrain freedom of speech but would motivate both counsel to follow the Professional Rules of Conduct, and heighten the parties' awareness of how an extrajudicial comment can adversely affect their own trial interests in a negative manner. The Order was issued to enforce the court's intent to have a speedy, impartial, and fair trial for all the parties involved. We considered the balancing which must be done between an individual's constitutional rights to free speech and a fair trial. These two rights must be balanced in the realm of a criminal trial.

It was our duty to protect this criminal trial from improper outside influences and it was not error to do so by executing our May 1, 2015 Order. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979) (noting that "a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial publicity.")

Appellant's issue with this court's Order was again addressed by Appellant when he filed a Motion to Vacate Prior Order, and for Special Order Prohibiting Extrajudicial Prosecutorial Statements on February 25, 2016 after the conclusion of the first jury trial. The Commonwealth filed a response and a hearing was held on March 24, 2016.[8] We took the matter under advisement and denied the Appellant's Motion to Vacate our May 1, 2015 Order. We found nothing new that would assuage our earlier conclusion that extrajudicial statements posed a substantial risk of prejudicing the parties and the potential jurors prior to the commencement of the re-trial of this case in June 2016. If anything, our concern increased as a result of the bickering in which both counsel engaged during the February 2016 proceedings. The court did not wish that type of "tit for tat" to take place in a public forum possibly influencing prospective jurors and witnesses. We continue to find that our action in issuing the Order requiring compliance with Rule 3.6 by both parties helped

---

[8] A transcript of this hearing, if one was prepared, has not been provided for this Court's review as part of the certified record.

secure a fair and impartial jury to hear Appellant's case in June 2016.

———

[4] There was no objection made by the Commonwealth to our entering the May 1, 2015 Order.

Trial Court Opinion, filed 1/20/17, at 9-13.

Upon our review of the record, we find no error. Significantly, although Appellant generally avers he was caused harm and that his constitutional rights were violated by the trial court's May 1, 2015, Order, in fact, the trial court's Order sought to prevent either side from thwarting Appellant's constitutional right to assemble a fair and impartial jury. Indeed, had the trial court given defense counsel an unfettered ability to comment about Appellant's case in the press, the opposite would have been the case. Moreover, any such statements would have been inapposite to Appellant's trial, for the trial court instructed the jurors to consider only the evidence presented at trial during its deliberations and explained that statements of counsel do not constitute evidence. N.T. Trial, 6/29/16, at 1535, 1540. As the trial court stressed, its Order did not prevent Appellant from exercising his right to free speech but rather permitted each party to do so as long as any comments did not violate the Pennsylvania Rules of Professional Conduct.

Also, Appellant urges us to consider statements Attorney Hogan allegedly made in other matters. It is axiomatic in Pennsylvania that "[a]n appellate court may consider only the facts which have been duly certified in the record on appeal." *Commonwealth v. Young*, 456 Pa. 102, 115, 317

A.2d 258, 264, (1974); Pa.R.A.P. 1921 (providing that the certified record on appeal consists of the "original papers and exhibits filed in the lower court, paper copied of legal papers filed with the prothonotary by means of electronic filing, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court.. . . "). As such, these references are irrelevant to our consideration of the matters raised in the instant appeal, and to the extent they were discussed at the March 24, 2016, hearing, we cannot consider them, for we have not received a transcript of that proceeding.

For all of the foregoing reasons, Appellant's claims fail, and we affirm the judgment of sentence.

Judgment of sentence affirmed. We direct the parties to attach a copy of the trial court opinion in the event of further proceedings.

Judge Musmanno joins the majority.

PJE Bender Concurs in the Result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/27/2017

COMMONWEALTH OF
PENNSYLVANIA

    v.

EDWARD J. O'BRIEN, III

IN THE COURT OF COMMON PLEAS
CHESTER COUNTY, PENNSYLVANIA

NOS.: CP-15-CR-0003361-2015
       CP-15-CR-0001743-2015

CONSOLIDATED: 2706 EDA 2016 &
          2708 EDA 2016

Nicholas J. Casenta, Jr., Esq. for the Commonwealth
Joseph P. Green, Esq. for Appellant

RULE 1925(a) OPINION

BY: WHEATCRAFT, J.

JANUARY 20, 2017

Edward J. O'Brien, III ("Appellant") appeals this court's August 17, 2016 judgment of sentence. Appellant was found guilty of Murder of the Third Degree (18 Pa.C.S. §2502(c)) and other charges related to the death of his father, Edward J. O'Brien, Jr. ("the decedent").

Appellant sets forth 11 errors in his Concise Statement of Errors Complained of on Appeal ("Concise Statement"): (1) The trial court erred in concluding there was sufficient evidence to prove Appellant had any duty to act; (2) The trial court erred in concluding there was sufficient evidence to prove Appellant's act(s) or culpable omission(s) caused the decedent's death and/or other harm; (3) The trial court erred in instructing the jury that Appellant had the burden to show it was the decedent's wishes that Appellant not act, in violation of his state and federal constitutional rights; (4) The trial court erred in excluding a prospective juror for cause due to the juror stating he "thought police officers had an interest in the outcome of the charges that they filed"; (5) The trial court erred in granting Appellant's Motion for Special Relief Prohibiting Extrajudicial Prosecutorial Statements without a hearing, and entering an Order

prohibiting both parties from making extrajudicial statements in violation of Appellant's First and Sixth Amendment rights to make curative public comment; (6) The trial court erred in instructing the jury that Appellant could be found guilty on any affirmative act "when there was no evidence to establish that any affirmative act was the legal cause of death"; [1,2] (7) The trial court erred in denying Appellant's Motion in *Limine* to exclude Appellant's statements; (8) The trial court erred in excluding statements of the decedent, and statements made by Appellant to the decedent, related to the decedent's "desires regarding medical treatment"; (9) The trial court erred in excluding statements, relevant to the issue of seclusion, made by Appellant to his neighbor "regarding the decedent's condition and treatment offered"; (10) The trial court erred in not finding

---

[1]   Appellant has waived this claim in that his "Defendant's Memorandum of Law in Opposition to Commonwealth Request for Jury Instructions, and in Support of Defendant's Motions in *Limine*," filed February 8, 2016 includes Appellant's requested jury instruction for "Duty to Act" and specifically contains the language to which he is now objecting. Additionally, there is no objection to that specific language found anywhere in the transcript from the June 2016 trial.

[2]   Appellant also suggests that his claim of error, related to establishing a criminal act, is supported by the "judgment of acquittal [being] granted on the 'acts' theory during the [appellant's] first trial." (Appellant's Consolidated Concise Statement of Matters Complained of on Appeal, 11/01/16, p. 2 , par. 6). This claim is not addressed in this Opinion for the following reasons:

(1) Appellant misstates the legal posture of this case prior to the June 20, 2016 jury trial. There is no past "judgment of acquittal" in the record. The first jury trial in February 2016 concluded in a mistrial resulting from that jury's inability to reach a verdict on any of the charges; and

(2) This claim, as stated, is obscure and too vague to permit the court to opine upon it. Appellant fails to set forth specific facts or law to allow a meaningful review by the court in this Opinion.

A Concise Statement is required by Pa.R.A.P. 1925(b) to insure "trial judges in each appealed case the opportunity to opine upon the issues which an appellant intends to raise, and thus provide appellate courts with records amenable to meaningful appellate review." *Commonwealth v. Castillo*, 888 A.2d 775, 779 (Pa. 2005). A Concise Statement that is "too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all." *Commonwealth v. Dowling*, 778 A.2d 683, 686-87 (Pa. Super. 2001). Therefore, this claim of error is deemed waived on appeal and is not addressed in this Opinion. *Id.* at 687.

prosecutorial misconduct during closing statements when the prosecutor questioned Appellant's feelings for his father that could allow Appellant to "let his father suffer like that"; and (11) The court erred in "imposing a manifestly unreasonable sentence and in applying the Sentencing Guidelines in an automatic fashion." (Appellant's Consolidated Concise Statement of Matters Complained of on Appeal, 11/01/16). For the reasons set forth below, we find no errors were made.

PROCEDURAL HISTORY

This case has a complex procedural history. On or about April 24, 2015, Appellant was charged with the following offenses:

1. Involuntary Manslaughter (18 Pa.C.S.A. §2504(a)),

2. Recklessly Endangering another Person (18 Pa.C.S.A. §2705),

3. Murder of the Third Degree (18 Pa.C.S.A. §2502(c)),

4. Theft by Unlawful Taking-Movable Property (18 Pa.C.S.A. §3921(a)), and

5. Receiving Stolen Property (18 Pa.C.S.A §3925(a))

The offenses of Murder of the Third Degree, Theft by Unlawful Taking-Movable Property, and Receiving Stolen Property were dismissed by a Magisterial District Justice after a preliminary hearing on May 11, 2015. The offenses of Involuntary Manslaughter and Recklessly Endangering another Person were held for trial and docketed at CP-15-CR-0001743-2015 in the Court of Common Pleas.

On August 3, 2015, the Commonwealth re-filed the offense of Murder of the Third Degree pursuant to Pa.R.Crim.P. 544(B) and added the offense of Aggravated Assault (18 Pa.C.S.A. §2702(a)(1)). The Commonwealth did not re-file the property offenses. The Murder and Aggravated Assault charges were held for trial after another preliminary hearing at a different Magisterial District Court on September 22, 2015. These charges

were docketed in the Court of Common Pleas at CP-15-CR-0003361-2015. Appellant waived arraignment in both cases, the matters were consolidated, and scheduled for trial before this court. Prior to trial, Appellant and the Commonwealth filed multiple pre-trial motions, some of which are the subject of Appellant's Concise Statement.

The first jury trial started February 16, 2016 and concluded with a mistrial due to a hung jury on February 24, 2016. Pursuant to Pa.R.Crim.P. 600, a second jury trial was scheduled to begin within 120 days, in June 2016. The jury for the second trial was selected on June 20, 2016 and a verdict was reached on June 30, 2016. Appellant was found guilty of all charges: Murder of the Third Degree, Aggravated Assault, Involuntary Manslaughter, and Recklessly Endangering another Person.

A Pre-Sentence Investigation was completed and a sentence of 5-10 years was imposed August 17, 2016 on the Murder charge. No sentence was imposed on the other offenses. On August 23, 2016, Appellant filed a timely Notice of Appeal and we issued a Pa.R.A.P. 1925(b) Order. On November 2, 2016[3], Appellant filed a Concise Statement.

## ERRORS CLAIMED BY APPELLANT

In his Concise Statement, Appellant sets forth 11 errors. For purposes of discussion and analysis we address Appellant's claims as nine issues:

I.   The court erred in granting Appellant's Motion for Special Order Prohibiting Extrajudicial Prosecutorial Statements and *sua sponte* extending it to Appellant without a hearing, and entering an Order precluding Appellant and defense counsel from making extrajudicial statements in response to the prosecution's initial

---

[3]   We granted Appellant's request for leave to amend his initial Concise Statement to allow him sufficient time to review the lengthy transcripts.

extrajudicial statements.

II.   The court erred in denying Appellant's pre-trial motion *in limine* to exclude Appellant's statements.

III.  The court erred in striking a juror for cause in response to the juror stating he thought police officers had an interest in the outcome of the charges that they filed.

IV.   The court erred in its legal conclusion that Appellant had a legal duty to provide physical and medical care for the decedent.

V.    The court erred in excluding the following evidence:

    A. the decedent's statements to Appellant related to the decedent's desires regarding his medical treatment,

    B. Appellant's statements to the decedent related to the decedent's desires regarding his medical treatment,

    C. Appellant's statements to Marie Henry, Appellant's neighbor, regarding the decedent's medical condition and treatment as it related to the issue of Appellant's alleged seclusion of the decedent.

VI.   Appellant was denied a fair trial due to prosecutorial misconduct during closing arguments when the prosecutor referenced Appellant's "complex psychology" and Appellant's possible "deep resentment, hatred, whatever it may have been, that would have caused [Appellant] to let his father suffer like this."

VII.  The evidence was insufficient to establish, beyond a reasonable doubt,

    A. that Appellant had any duty to act,

    B. that any act or culpable omission of the Appellant was the legal cause of death and/or other harm to the decedent.

VIII. The court erred in giving an affirmative defense instruction and placing the burden to show "no duty" on the Appellant.

IX. The court erred in imposing a "manifestly unreasonable sentence", and applying the Sentencing Guidelines "in an automatic fashion."

## FACTS

The evidence presented at trial established the following facts: On September 8, 2013, officers responded to a 911 call at Appellant's home. Appellant had called reporting that his father had stopped breathing. Upon arriving at the home, Appellant called the officers upstairs. Officers testified that the odor of feces grew stronger the closer they came to the decedent's bedroom. In the decedent's bedroom it was over-powering. Officers found Appellant and Appellant's partner, Mr. Rashid, in the bedroom with the body of the decedent. The decedent was clothed only in a tee shirt and appeared malnourished. There were feces on the body and very large, deep, black sores evident on several areas of the decedent's body. Dried feces were observed dripping down the side of the bed box spring, on the seat and arms of the only small chair in the room, on the nightstand next to the bed, and on the carpet. The patrol officers were concerned about the circumstances they found and called a detective to the scene for further investigation.

Through an interview with Appellant on the same day, September 8, 2013, it was determined that the decedent had been living with Appellant since May 2011. The decedent had been brought to Appellant's home by Appellant, from the Cooper River West Skilled Nursing Facility ("Cooper River") in New Jersey. Prior to Cooper River, the decedent had been hospitalized after being injured when he fell in his Collingswood, NJ home.

Through further investigation, detectives discovered that prior to being moved to

Appellant's home; the decedent lived on his own in Collingswood and had seen his physician very regularly since the 1970's. He had been prescribed various medications to treat his congestive heart failure and other conditions. While not perfectly compliant with his medication regimen, the decedent had been taking prescribed medications and seeing his doctor very regularly for many, many years. Appellant told the detective that the decedent had seen a physician only once after being moved to Appellant's home and that was in October 2011 when the decedent had complained for over an hour of chest pain and Appellant decided to do as his father was requesting, and took him to the hospital.

Appellant testified to the fact that other than the one trip to the hospital in October 2011, the decedent had left the second floor bedroom on only one other occasion during the two and a half years he lived there. The decedent had managed to get downstairs and out of the house while he was home alone in the spring of 2012. He was found by Appellant's neighbor on her porch. He was asking her to call a cab so that he could return to his own home in Collingswood, NJ.

Appellant testified that at the time he took his father from Cooper River to his home, in May 2011, Appellant had received instructions from his father's treatment providers at Cooper River that his father needed around the clock care and could not be left alone. Appellant was also given documentation and prescriptions for his father to continue his treatment for his medical conditions. In October 2011, when the decedent was taken to the Chester County Hospital's emergency room for his complaints of chest pain, the nursing records indicated that the decedent's appearance was dirty and unkempt. His groin was excoriated and there were dried feces on his buttocks; there was food in his hair. Appellant admitted to the doctor treating his father that he was having difficulty providing the care his father needed, by himself. The doctor prescribed a home health care agency to assist

Appellant. The decedent was again discharged with medications and was instructed to follow up with his primary care physician. During his interview on September 8, 2013, when asked by the detective if Chester County Hospital had wanted the decedent on any medications, Appellant answered, "No."

The home health care agency recommended by the hospital doctor visited Appellant's home on one occasion for an assessment; and a treatment plan was prepared. Through testimony, it became clear that the nurses were never able to treat the decedent after that initial visit, though attempts were made on at least five occasions to visit the decedent. Appellant did not arrange a time for them to help care for his father.

Appellant indicated that his father started deteriorating six months prior to his death; and that at about four weeks before his death, the decedent started to develop bedsores. At that point, the decedent was rarely out of the twin bed where he was propped up with pillows. There was no hospital bed, no air mattress, no comfortable chair in the decedent's bedroom. Appellant tried to treat the bedsores with soap and water, hydrogen peroxide, bandages, and Neosporin, but the incontinence his father had been experiencing continued and the sores worsened over the four weeks before his father's death.

When asked by the detective why Appellant hadn't secured medical care for his father, particularly when he saw him deteriorating the six months before his death, Appellant said, "Frankly, I figured he was 92 years old." (Comm. Exh. 30A, p. 20, ll. 29-32). When asked why he didn't take him to the doctor, Appellant said, "I don't think he really wanted to go." *Id.* at p.15, l. 28. When asked if that was a decision the decedent and Appellant discussed, he responded, "I – there wasn't really any discussion." *Id.* at p. 47, l. 42 – p. 48, l. 1. When speaking of the worsening bedsores, Appellant stated, ". . . they were of a point where, hmmm, I knew that I had to do something about it and sooner

rather than later. ... I figured I really have to take him to the doctor but I hadn't decided to do that just yet because it would really be – I just hadn't decided to do that yet." *Id.* at p. 21 ll. 33-34, p. 21, l. 45 - p. 22, l. 1. On the day of his father's death, during the one hour and 10 minute interview with the detective in his dining room, when asked on several occasions about the lack of physician care and the lack of prescribed medications for his father, Appellant never indicated that his father refused medical care or medications.

## DISCUSSION

### I. Order Relating to Extrajudicial Statements

Appellant's first issue complained of on appeal is that the court erred in granting Appellant's Motion for Special Order Prohibiting Extrajudicial Prosecutorial Statements, *sua sponte* extending it to Appellant without a hearing, and entering an Order precluding Appellant and his defense counsel from making extrajudicial statements in response to the prosecution's initial extrajudicial statements.

There is little guidance as to the standard of review when addressing a court's order limiting extrajudicial statements by counsel. It has been previously determined that court imposed "limitations on the speech of attorneys involved in pending litigation, even when such limitations are prior restraints on the attorney's First Amendment rights, will be constitutional if the prohibited speech is limited to that which contains a substantial likelihood of material prejudice to an adjudicatory proceeding." *Commonwealth v. Lambert*, 723 A.2d 684, 686 (Pa.Super. 1998). It is also appropriate to limit speech when the limitation "does not constrain the access to or the publication of a trial's events, testimony, or evidence." *Id.* When these guidelines are met, the limitation on speech has been found to be constitutionally acceptable:

Appellant filed a Motion for Special Order Prohibiting Extrajudicial Prosecutorial Statements on April 30, 2015. In his Motion, Appellant averred that:

> Thomas P. Hogan, Esquire, acting as District Attorney of Chester County, undertook a calculated campaign of extrajudicial statements designed and intended to unfairly prejudice [Appellant]. ... [He] caused his assistant ... to issue a Press Release to local outlets[] [t]hat ... included numerous false and misleading statements, calculated to impair the [Appellant's] right to a fair and impartial trial, which had ... a substantial likelihood of increasing public opprobrium of the accused. For example, the statement includes ...

>> 'This was no way for any person to die. If somebody treated an animal so shamefully, everybody would be horrified. The fact that it happened to an elderly man, and was caused by the man's own son, is inexcusable.'

(See Appellant's Motion for Special Order, 04/30/15). The Chester County District Attorney, Thomas P. Hogan, also made the following references:

> This was a death without dignity. ...

> [The decedent] was put in a back bedroom to rot. ...

> [W]hat we often see in these cases is the parent is just not dying fast enough, so somebody starts taking money, and not caring for their parents. *Id.*

One of the headlines stated "Son Left Dad to Rot." (NBC News10, Alison Burdo, 04/2015). Appellant's counsel responded to the above statements in the press and his client's position was also reported by the media, including his opinion that Mr. Hogan was effectuating "trial by press release." (Chadds Ford Live, Kathleen Brady Shea, 04/29/15). Appellant requested that the court issue an order limiting extrajudicial statements by the Commonwealth as authorized by Pa.R.Crim.P. 110, and we did. We found there was no need for a hearing as the facts averred by Appellant's counsel were readily available for the court to review in the local paper and news outlets. We found

that Mr. Hogan's statements had a substantial likelihood of heightening public condemnation for Appellant.[4] (Pa.R.P.C. 3.8, Special Responsibilities of a Prosecutor).

Appellant's objection to the Order is that it applied to the defense as well as the prosecution. Appellant now argues that he and his counsel were deprived of their First Amendment right to free speech by the court's May 1, 2015 Order. The Order stated in part:

> Counsel for [Appellant] and counsel for the Commonwealth are precluded from public comment about this case except in accordance with Rule 3.6 of the Rules of Professional Conduct.

Rule 3.6 of the Pennsylvania Rules of Professional Conduct ("Rule 3.6") sets forth the limits of extrajudicial comments related to trial publicity. All counsel are bound by the ethical mandates of Rule 3.6. We found it necessary to remind counsel of their ethical obligations. We did not preclude Appellant nor his counsel from exercising their right to free speech. Defense counsel was free to respond to any comments he felt necessary to protect his client from undue prejudice, so long as those comments did not violate Rule 3.6.

Additionally, paragraph 4 of the Order stated that counsel should advise the parties and witnesses about the possible consequences of making extrajudicial statements during the course of trial and jury selection. This paragraph reminded counsel and the parties that extrajudicial statements have real consequences, i.e. the delay of trial proceedings and extended jury selection due to media coverage of extrajudicial statements prejudicing the general jury pool, influencing the opinions and recollections of witnesses, etc. A determination to see if there was improper intrusion

---

[4] There was no objection made by the Commonwealth to our entering the May 1, 2015 Order.

into Appellant's and his counsel's free speech rights must be made using the entire record. *Commonwealth v. Lambert*, 723 A.2d 684 (Pa.Super. 1998), *citing Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038 (1991).

At the time the Order was issued, the court was fully aware that the relationship between Appellant's defense counsel and the Chester County District Attorney's Office, specifically District Attorney Thomas Hogan, was markedly hostile. Therefore, we structured our Order in a manner that would not restrain freedom of speech but would motivate both counsel to follow the Professional Rules of Conduct, and heighten the parties' awareness of how an extrajudicial comment can adversely affect their own trial interests in a negative manner. The Order was issued to enforce the court's intent to have a speedy, impartial, and fair trial for all the parties involved. We considered the balancing which must be done between an individual's constitutional rights to free speech and a fair trial. These two rights must be balanced in the realm of a criminal trial.

It was our duty to protect this criminal trial from improper outside influences and it was not error to do so by executing our May 1, 2015 Order. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979)(noting that "a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial publicity.")

Appellant's issue with this court's Order was again addressed by Appellant when he filed a Motion to Vacate Prior Order, and for Special Order Prohibiting Extrajudicial Prosecutorial Statements on February 25, 2016 after the conclusion of the first jury trial. The Commonwealth filed a response and a hearing was held on March 24, 2016. We took the matter under advisement and denied the Appellant's Motion to Vacate our May 1, 2015 Order. We found nothing new that would assuage our earlier conclusion that

extrajudicial statements posed a substantial risk of prejudicing the parties and the potential jurors prior to the commencement of the re-trial of this case in June 2016. If anything, our concern increased as a result of the bickering in which both counsel engaged during the February 2016 proceedings. The court did not wish that type of "tit for tat" to take place in a public forum possibly influencing prospective jurors and witnesses. We continue to find that our action in issuing the Order requiring compliance with Rule 3.6 by both parties helped secure a fair and impartial jury to hear Appellant's case in June 2016.

## II. Denial of Appellant's Motion *in Limine* to Exclude Appellant's Statements

Appellant claims the court erred in denying Appellant's pre-trial motion *in limine* to exclude Appellant's statements pursuant to the *corpus delicti* rule. On February 8, 2016, Appellant filed a motion *in limine* setting forth four requests, however this issue is the only one of those requests raised for purposes of this appeal. The standard of review on challenges to an evidentiary ruling is limited to a determination of whether the trial court abused its discretion. *Commonwealth v. Young*, 904 A.2d 947, 956 (Pa.Super. 2006), *appeal denied*, 916 A.2d 633 (Pa. 2006), (*quoting Commonwealth v. Rivera*, 828 A.2d 1094, 1103–04, n. 10 (Pa.Super. 2003) *appeal denied*, 842 A.2d 406 (Pa. 2004)).

Appellant argued in his pre-trial motion that any statements made by Appellant prior to his arrest should be excluded from the evidence to be presented at trial. Appellant alleged that the Commonwealth was not going to be able to meet its burden to show sufficient evidence of a crime. We did not agree and denied Appellant's request.

The *corpus delicti* rule requires that the Commonwealth present evidence that is sufficient to satisfy the trial court that a crime has occurred, i.e. that it is more likely than not that a crime has occurred. *Commonwealth v. Hernandez*, 39 A.3d 406 (Pa.Super. 2012). The trial court may wait until the end of the case to make its determination as to whether the jury can consider the statement. *Commonwealth v. Cuevas*, 61 A.3d 292, 295 (Pa.Super. 2013), *citing Commonwealth v. Hogans*, 400 Pa.Super. 606, 584 A.2d 347, 349 (1990).

We found that this burden was likely to be met by the end of trial. During pre-trial proceedings the court viewed the pictures depicting the condition of the decedent's body. Those photos were compelling in that the decedent had several large, black bedsores, some showing decay almost to the bone. The pictures also showed that the decedent's body was covered in feces and provided evidence tending to show that the decedent had been malnourished. The officers, responding to the 911 call placed by Appellant, represented that there was a foul stench emanating from the decedent's bedroom where they found him in the midst of his own feces. We found these facts supported a finding that a crime had been, more likely than not, committed. It is not required that Appellant's statement encompasses an admission to each element of the crime. *Commonwealth v. Buck*, 626 A.2d 176 (Pa.Super. 1993) (*overruling Commonwealth v. Palmer*, 402 A.2d 530 (Pa.Super. 1979)). A determination as to whether Appellant was criminally responsible for the decedent's death or harm is also not a component of the rule. *Buck*, supra; *see also Commonwealth v. Tessel*, 500 A.2d 144 (Pa.Super. 1985)(proof of the identity of the perpetrator is not required by the *corpus delicti* rule). That determination is for the jury to make, beyond a reasonable

doubt. Accordingly, we find no error in determining that the *corpus delicti* rule did not require the exclusion of Appellant's statements[5] to law enforcement officers.

### III. Striking Prospective Juror for Cause

Appellant alleges that the trial court erred in striking a prospective juror for cause at the Commonwealth's request, over his objection. When determining the appropriateness of striking a juror, the trial court must examine whether the prospective juror demonstrated a likelihood of prejudice by conduct or answers to the questions posed. It "depends upon the answers and demeanor of the potential juror as observed by the trial judge" whether striking is appropriate. Reversal of the trial court's determination is warranted only "in the case of palpable error." *Commonwealth v. Johnson*, 445 A.2d 509, 512 (Pa.Super. 1982) (quoting *Commonwealth v. Colon*, 299 A.2d 326, 328 (Pa.Super. 1972); *Commonwealth v. Stevens*, 739 A.2d 507 (Pa. 1999)).

Appellant claims that the trial court erred in striking Juror No. 80 for cause from the prospective jury panel. The test for whether a prospective juror should be stricken for cause is whether the juror is willing to put aside any biases or prejudices and whether the juror will follow the proper instructions of the court. *Commonwealth v. Briggs*, 12 A.3d 291 (Pa. 2011), petition for cert. filed (U.S. June 29, 2011). During *voir dire*, the trial court was focused on examining all prospective jurors for their ability to render a fair and just verdict in accordance with the testimony presented during trial.

*Voir dire* of the juror panel was handled individually with the trial judge and counsel

---

[5] We note that much of Appellant's statement to law enforcement was not inculpatory or material to the prosecution's case and thus not protected by the *corpus delicti* rule. *Commonwealth v. Verticelli*, 706 A.2d 820 (Pa. 1998) (rejecting Superior Court conclusion that rule applies to all material statements) (abrogated on other grounds by *Commonwealth v. Taylor*, 831 A.2d 587 (Pa. 2003)).

present. Each counsel was given full and fair opportunities to ask questions of the panel members. Juror No. 80 was questioned by the prosecutor, Deputy District Attorney Ronald C. Yen:

Yen: I just have a question. On the questionnaire you answered you were more inclined to disbelieve a police officer just because it's a police officer. Do you remember that?

Juror No. 80: Yes

Yen: Do you still look at things that way?

Juror No. 80: Well, it's about, you know, conflict of interest type situation. People in authority should be held to higher scrutiny. That's what I believe. Goes no further than that.

...

Juror No. 80: ... Things don't go the right way with an arrest·or something like that, in my opinion they may be more likely to bend the truth. That's my only consideration with that.

(N.T., 06/20/16, Vol. I, p. 158, ll. 6-25).

Yen: ... I do understand that one has a view that police officers should be held to a higher standard.

Juror No. 80: Yes.

Yen: But it doesn't necessarily follow that they would be more likely not to be truthful or does it to you?

Juror No. 80: · Well, to me [it] depends on the situation.

(N.T., 06/20/16, Vol. I, p. 159, ll. 1-7).

Juror No. 80: Well, basically you have certain interests as a police officer that you wouldn't have if you were not a

police officer. That's the distinction.

(N.T., 06/20/16, Vol. I, p. 160, ll. 14-16).

Juror No. 80 did not give a complete answer. The trial court determined that Juror 80 would most likely not be able to put aside his belief that a police officer would lie if the officer believed lying would help secure a conviction. We found his manner and speech pattern to be hesitant and conflicted. It was clear to this jurist that Juror No. 80 could not give a clear assurance that he would be able to put aside his prejudice and bias against a police officer's self-interests until he heard the facts of the case, and at that point, it would be too late to impanel a fair jury. We do not find it was an abuse of discretion to strike Juror No. 80 over Appellant's objection.

### IV. Appellant's Legal Duty to Act

Appellant claims we erred, as a matter of law, in allowing the offenses charged to go to the jury for determination. Appellant argues that each of the crimes require the commission of an "act" of which there was no evidence. It was our determination that an "act" is not required by the Criminal Code, when there is an omission or failure to act relative to a legal duty. *See* 18 Pa.C.S.A. §301 (Requirement of Voluntary Act). Appellant submits that 18 Pa.C.S.A. §301(2) requires the finding of a legal duty imposed by law, and that although Appellant may have had a moral duty to care for his elderly father, there is no duty imposed by law which obligated him to take care of his father. As a result, he suggests there is no criminal liability for the quality of care, or lack of care, he provided his father prior to his death.

We addressed this issue pre-trial and made an initial determination of whether Appellant had a legal duty to care for his father. *Walters v. UPMC Presbyterian*

*Shadyside*, 144 A.3d 104 (Pa.Super. 2016) (whether a legal duty of care exists is a question of law to be determined initially by the trial court), *citing Winschel v. Jain*, 925 A.2d 782, 796 (Pa.Super. 2007); *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1219 (Pa. 2003). We looked to civil tort law and found that the legal duty relating to caring for a helpless person, such as the decedent presented in this case, is addressed by the Restatement of the Law-Torts §324, Duty of One Who Takes Charge of Another Who is Helpless (1965)("Restatement §324"). Restatement §324 was accepted and enforced in the Commonwealth as early as 1955 in *Karavas v. Poulos*, 113 A.2d 300 (Pa. 1955). Restatement §324 states:

> One who, being under no duty to do so, takes charge of another who is helpless to adequately aid or protect himself is subject to the other for any bodily harm to him by:
> (a) The failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
> (b) The actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

(Restatement of the Law-Torts §324, Duty of One Who Takes Charge of Another Who is Helpless (1965)("Restatement §324")).

The facts presented in this case support a finding that Appellant had a civil legal duty to provide his father with care. The discharge documents given to Appellant at the time he removed his father from Cooper River in May 2011, clearly indicated that the decedent needed care and supervision 24 hours a day, seven days a week. Appellant testified that he had discussions with the social worker at Cooper River about the need for the decedent to either be in a skilled nursing facility or have around the clock care at home. The discharge instructions also included a list of medications prescribed for the

decedent. Again, in October 2011, an emergency room doctor at Chester County Hospital prescribed in-home nursing care and a number of medications to address the decedent's medical conditions. In both instances, Appellant was also instructed that he needed to follow up with his father's primary care physician.

Appellant knew about the medical and physical care his father required at the time he originally removed his father from Cooper River. On that very first day, when the decedent was taken to Appellant's home, Appellant assumed the civil legal duty set forth in Restatement §324. Failure on Appellant's part "to exercise reasonable care to secure the safety of the [decedent] while within [Appellant's] charge," or the discontinuance of aid and protection that results in placing the decedent "in a worse position than when [Appellant] took charge," is a breach of Appellant's civil legal duty to his father and gives rise to civil liability. *Id.*

We next examined whether this civil legal duty can give rise to criminal liability under the Criminal Code. It is a general principle of law that criminal liability attaches when an act is committed. *See* 18 Pa.C.S.A. §301(a) (Requirement of Voluntary Act). 18 Pa.C.S.A. §301(b) states that criminal "[l]iability for the commission of an offense may not be based on an omission unaccompanied by action". *Id.* However, it goes on to state that an omission unaccompanied by an action gives rise to criminal liability when:

> (1) the omission is expressly made sufficient by the law defining the offense; or
>
> (2) **a duty to perform the omitted act is otherwise imposed by law.**

18 Pa.C.S.A. §301(b)(emphasis added). [6]

Not surprisingly, Appellant argued that the crimes charged did not expressly impose a duty on Appellant to provide medical treatment or care for his father. Appellant also argued that there is no duty imposed by any other law. As a result, he suggests, the court erred as a matter of law to permit any criminal charges against Appellant to proceed to trial. We agree with Appellant that an omission or failure to act is not expressly set forth as an element of the offenses charged. Nonetheless, we found that criminal liability might still arise under 18 Pa.C.S.A. §301(b)(2) if Appellant's civil legal duty under Restatement §324 met the requirements of 18 Pa.C.S.A. §301(b)(2).

This question was addressed by the Superior Court in *Commonwealth v. Pestinikas*, 617 A.2d 1339 (Pa.Super. 1992). The *Pestinikas* court accepted the principle that any duty set forth in civil law meets the requirements of 18 Pa.C.S.A. §301(b)(2). *See Pestinikas* at 1343, *citing* S. Toll, Pennsylvania Crimes Code Annotated, §301, at p. 60 (*quoting* Comment, Model Penal Code §2.01 (1974)). S. Toll commented that if a duty requires action, for the purposes of the Crimes Code, the failure to act may result in criminal liability. *Id.* The *Pestinikas* court looked to the civil law of contracts since that best suited the facts before it. [7] Considering the facts of this

---

[6] 18 Pa.C.S.A. §301 sets forth the generally accepted principle that "in order to be criminally liable for a failure to act or for an omission, such as failing to care for an elderly parent, a corresponding legal duty to act must exist" first. (Joann Blair, "Honor Thy Father and Mother"-- But for How Long?--Adult Children's Duty to Care for and Protect Elderly Parents, 35 U. Louisville J. Fam. L. 765 (1996), citing Wayne R. Lafave & Austin W. Scott, Substantive Criminal Law § 3.3(a) (2d ed. 1986); Deborah A. Goodall, Penal Code Section 22.04; A Duty to Care for the Elderly, 35 Baylor L. Rev. 589, 589-90 (1983)).

[7] Other states have used civil law tenets to find that a failure to perform a legal duty can give rise to criminal liability. In *State v. Brown*, 129 Ariz. 347, 631 P.2d 129 (1981), the Court of Appeals for Arizona affirmed a manslaughter conviction of the operator of a boarding home in connection with the starvation death of a ninety-eight year old resident. The Arizona Court interpreted a statutory provision, which is similar to our 18 Pa.C.S.A. §301, as follows:

case, we determined that the duties set forth in Restatement §324 met the requirements of 18 Pa.C.S.A. §301(b)(2).

Although *Pestinikas* held that the minimum requirements of 18 Pa.C.S.A. §301(b)(2) are met by Restatement §324, we must go on to examine whether the omission or failure to act constitutes an offense. In *Pestinikas,* the Superior Court acknowledged that not every "breach of [a legal duty] can become the basis for a finding of homicide resulting from an omission to act." *Pestinikas,* supra at 1345. All of the elements of an offense must be met before homicide, at whatever level, is proven.

The *Pestinikas* court held that:

> A criminal act involves both a physical and mental aspect. ... Even where there is a [legal] duty imposed ..., the omission to act will not support a prosecution for homicide in the absence of the necessary *mens rea* [attributed to the specific offense]. For murder, there must be malice. Without a malicious intent, an omission to perform duties ... cannot support a conviction for murder. In the instant case, therefore, the jury was required to find that appellants, by virtue of [a] contract, [a legal duty imposed by law] had undertaken responsibility for providing necessary care for [the decedent] to the exclusion of the members of [the decedent's] family. This would impose upon them a legal duty to act to preserve [the decedent's] life. If they maliciously set upon a course of withholding food and

---

As stated in A.R.S. Sec. 13–201 and demonstrated by the case law, the failure to perform a duty imposed by law may create criminal liability. In the case of negligent homicide or manslaughter, the duty must be found outside the definition of the crime itself, perhaps in another statute, or in the common law, or in a contract.

medicine and thereby caused [decedent's] death, appellants could be found guilty of murder.

The Superior Court further explained their holding in *Pestinikas* six years later in *Commonwealth v. Kellam*, 719 A.2d 792 (Pa.Super. 1998). The *Kellam* court upheld the murder conviction of Mr. Kellam relating to the death of an infant. It set forth four instances when the breach of a legal duty gives rise to criminal liability:

> [W]e note that criminal liability may be based on either an affirmative act **or** a failure to perform a duty imposed by law. 18 Pa.C.S.A. §301, Requirement of [V]oluntary [A]ct. …
>
> [T]he failure to act may constitute the breach of a legal duty [and give rise to criminal liability] (1) where [the legal duty is] expressly provided by statute, (2) where one stands in a certain status relationship to another, (3) where one has assumed a contractual duty to care for another, **or (4) where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid.**

*Kellam* at 796*, citing Commonwealth v. Pestinikas*, 617 A.2d 1339 (Pa.Super. 1992) (emphasis added).

After considering the statutory and common law principles set forth above, we found that criminal liability, as set forth in the Criminal Code is not limited to an affirmative "act." Therefore, we do not find it was error to decide that the elements of the offenses charged in this case may be met by a failure to act where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others

from rendering aid. Such an omission and failure exposed Appellant to criminal liability. *Id.*

The issue of whether the Commonwealth met its burden to prove beyond a reasonable doubt that Appellant had voluntarily assumed care for his father and secluded him, preventing others from rendering the care his father needed, as well as the elements of the offenses charged, were questions of fact that were presented to the jury for deliberation. The jury found that, indeed, the Commonwealth had met its burden.

## V. Exclusion of Evidence

Appellant alleges the trial court erred by sustaining the Commonwealth's objection to evidence Appellant sought to introduce relating to statements made by the decedent and Appellant. The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the over-riding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. *Commonwealth v. Herb*, 852 A.2d 356, 363 (Pa.Super. 2004).

A.    The Decedent's Statements to Appellant Related to the Decedent's Desires Regarding His Medical Treatment.

The court is unclear as to which of the decedent's statements Appellant argues were erroneously excluded from evidence. (*See* Concise Statement, 11/01/16, p. 2, par. 8). All statements made by the decedent to Appellant related to the decedent's wishes to forego medical treatment were admitted, as well as the statements made by Appellant to

the decedent.[8]  We found two instances of a Commonwealth objection to Appellant testifying to the decedent's behavior and/or wishes. The first was when Appellant explained that a doctor "gave [the decedent] hell" for non-compliance with his medication regimen. (N.T., 06/27/16, Vol. VI, p. 1123, ll. 9-13). The Commonwealth objected to the statement as hearsay and the objection was sustained. We found no foundation was laid that this was a statement made to Appellant by the decedent. Defense counsel did not rephrase the question. *Id.* at ll. 15-25. Additionally, later in the testimony, Appellant testified to medical records reflecting that the decedent failed to take his medications for six weeks because he did not refill a lost bottle of medicine. (N.T., 06/27/16, Vol. VI, p. 1126, ll. 4-8).

The second instance of an objection was when defense counsel asked Appellant on direct examination if the decedent ever had the view that Medicare and other medical services were too expensive. (N.T., 06/27/16, Vol. VI, p. 1131, l. 21-24). An objection was immediately made prior to Appellant answering and the objection was sustained. Again, we found that there was a lack of foundation as to where Appellant may have obtained this information, and defense counsel did not rephrase the question.

For the purposes of Appellate review, we find that even if these evidentiary determinations were an abuse of discretion, it was harmless error. The points Appellant was trying to make to the jury with these questions were covered by the introduction of other evidence; either Appellant's own statements of what the decedent told him or through the exhausting number of medical records which showed the decedent's lapses in taking his medication. Appellant was able to establish to the jury that the decedent was not always compliant with his medication regimen and that it was Appellant's position that the

---

[8]  *See* N.T. 06/29/16. P. 1360, l. 18 – p. 1361, l. 7.

care he provided complied with the wishes communicated to him by the decedent.

        B.       Appellant's Statements to the Decedent Related to the Decedent's Desires Regarding His Medical Treatment.

After reviewing the Notes of Testimony, we found no objections were made relating to statements made by Appellant to the decedent. As a result, we find no need to review this claim of error.

        C.       Appellant's Statements to Marie Henry, Appellant's Neighbor, Regarding the Decedent's Medical Condition and Treatment as it Related to Appellant's Seclusion of the Decedent.

Appellant's neighbor, Marie Henry, testified on behalf of Appellant June 29, 2016. Her testimony was very brief. Again, Appellant has failed to identify exactly which objections are at issue. Our review of the record finds that Ms. Henry testified that she has known Appellant for many years and that they both served on their homeowner's association board through the years. She was aware that the decedent had moved in with Appellant and was living there for approximately two years prior to his death. She was made aware of the death of Appellant's father by the police cars and ambulance that responded to Appellant's home September 2013. (N.T., 06/29/16, Vol. VIII, pp. 1336-1342).

Ms. Henry was permitted to testify to the several conversations she had with Appellant about the decedent. She testified that these conversations routinely concerned the decedent's general condition. Id. at p. 1342, ll. 2-10. Appellant wished to have Ms. Henry testify to the particular statements Appellant made to her during the conversations to show "that [Appellant] talked about the medical condition of his father during that two years" to address the Commonwealth's position that the decedent was secluded by Appellant during those two years. (N.T., 06/29/16, Vol. VIII, p. 1340, ll. 1-6). We permitted

the testimony so far as it rebutted the Commonwealth's allegation of seclusion. *See* FN. 8.

Appellant set forth a second argument, that Appellant's statements are an "operative fact, like consent to a contract. ... It's [being] offered as an act." *Id.* at ll. 7-10. Appellant made this same argument regarding statements made by the decedent in his Memorandum of Law Regarding Statements of Decedent filed February 22, 2016. We did not find that argument persuasive. We found that the testimony sought to be elicited from Ms. Henry regarding the specifics of what was discussed was being offered for the truth of the matter asserted and was therefore inadmissible hearsay. The seclusion issue was fully addressed by Ms. Henry's admission that she knew the decedent resided with Appellant for two years. (N.T., 06/29/16, Vol. VIII, p. 1338, p. 1342, ll. 2-10).

## VI. Prosecutorial Misconduct During Closing Arguments

Appellant claims that the trial court erred in not finding prosecutorial misconduct during closing arguments when the prosecutor, Mr. Yen, commented on Appellant's feelings for his father though there was no objection raised during trial. The standard of review for "a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Rolan*, 964 A.2d 398, 410 (Pa.Super. 2008). The Appellant is entitled to a "fair trial, not a perfect one." *Id.* (*quoting Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 928 A.2d 1289 (Pa. 2007)). The appellate court should affirm the trial court's determination unless there is a finding of a flagrant abuse of discretion. *Commonwealth v. Potts*, 460 A.2d 1127, 1136 (Pa. Super. 1983).

Appellant claims it was inappropriate and prejudicial for the prosecutor to make the following closing remarks:

Yen:    Was he concerned about his father or for some

> reason did [Appellant] have some sort of love/hate relationship? This is complex psychology. But [Appellant's] behavior suggests that there was some deep resentment, hatred, whatever it may have been, that would have caused [Appellant] to let his father suffer like this.

(N.T., 06/29/16, Vol. VIII, p. 1521, ll. 14-18).

We first note that Appellant's counsel did not object immediately to the above remark, nor did Appellant's counsel make an objection to that statement at the conclusion of the prosecutor's closing remarks. Although Appellant's counsel did place an objection and a request for relief on the record after the closing remarks, his objection related to the prosecution's misstatement of the law related to acts and omissions and not to the prosecutor's remarks on Appellant's state of mind, psychological status, or relationship with the decedent. Appellant also did not make a request for a curative instruction or a mistrial. (N.T., 06/29/16, Vol. VIII, p. 1522, l. 19 - p. 1526, l. 2). Such an omission on defense counsel's part acts as a waiver of the alleged error. Due to the failure to object, the trial court did not have an opportunity to correct any possible prejudicial effect stemming from the prosecutor's remarks and the issue is not preserved for appellate review. *Commonwealth v. Davenport*, 342 A.2d 67 (Pa. 1975); *Commonwealth v. Sampson*, 311 A.2d 624 (Pa. 1973). Nonetheless, in the event the Appellate Court does not agree with our waiver determination, we shall review the merits of Appellant's claim of prejudice.

We begin with the principle that even "where the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required." *Commonwealth v. Jarvis*, 394 A.2d 483, (Pa. 1978), *citing Commonwealth v. Crittenton*,

191 A. 358, 361 (Pa. 1937). During closing remarks, the prosecutor has the ability to present the facts in evidence that support his position and suggest the legitimate inferences that can be drawn from those facts. The closing remarks cannot be reviewed in isolation. *E.g., Commonwealth v. Revty,* supra; ABA Standards §5.8, supra 6a; *Commonwealth v. Sampson,* 900 A.2d 887, 890 (Pa.Super. 2006). "It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." *Commonwealth v. Holley,* 945 A.2d 241, 250 (Pa.Super. 2008) (internal citations and quotations omitted), *citing Commonwealth v. Paddy,* 800 A.2d 294, 316 (Pa. 2002).

We find that Mr. Yen's remarks were supported by the evidence and the inferences he suggested may be reasonably derived therefrom. Just prior to this statement, the prosecutor pointed to specific actions and omissions of Appellant which impacted the decedent, and asked, "What do you glean from that in terms of [Appellant's] state of mind?" (N.T., 06/29/16, Vol. VIII p. 1521, ll. 13-14). The prosecutor's remarks speak to the Appellant's motivation. It presents questions relating to the reasons Appellant acted or refrained from acting. The reasons may be explained by Appellant having a "love/hate relationship ... [or the] complex psychology" of their relationship. *Id.* at ll. 14-15.

This is acceptable argument, especially in this case where Appellant took the stand and testified extensively as to his motivation in caring for his father at Appellant's home, not seeking medical treatment for his father for over two years, and not assisting with his father's medication regimen. The testimony offered by Appellant centered on the fact that his father, the decedent, wished to be left without such care. Appellant

brought his motivation into this case, and made it a central part of his defense. We find that the prosecutor's remark was in fair response to Appellant's own testimony. As a result, it is not an abuse of discretion to find Mr. Yen's remarks were not improper or prejudicial, but merely an interpretation of the evidence with an "oratorical flair." *Commonwealth v. Chester*, 587 A.2d 1367 (Pa. 1991), *denial of post-conviction relief aff'd by* 726 A.2d 346 (Pa. 1999), *see also Commonwealth v. Anderson*, 461 A.2d 208 (Pa. 1983).

### VII.  Sufficiency of the Evidence

Appellant claims that the evidence related to his legal duty to care for his father was insufficient to allow a reasonable person to find, beyond a reasonable doubt, that Appellant was guilty. It is also Appellant's position that the evidence related to causation was insufficient to meet the Commonwealth's burden.

The standard of review when examining the sufficiency of the evidence presented is to determine,

> [when] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, [whether] there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. ... [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.

*Commonwealth v. LaBenne*, 21 A.3d 1287, 1289 (Pa.Super. 2011).

Evidence shall be found to be sufficient unless it is so weak and inconclusive that, as a matter of law, the facts necessary to prove the elements of guilt cannot be established from the combined circumstances presented. *See Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super. 2001).

Appellant argues there was insufficient evidence to establish: (1) Appellant had a legal duty to provide medical care for his father, the decedent, or (2) that the decedent's direct cause of death was the result of Appellant's failure to provide medical care to the decedent. We address each claim separately.

A.    Legal Duty

Appellant claims there was insufficient evidence to prove, beyond a reasonable doubt, that Appellant had a legal duty to provide medical care to his father. The legal determination that Appellant had a legal duty to the decedent is addressed previously in this Opinion. We address the sufficiency of the evidence to prove the Appellant's legal duty beyond a reasonable doubt here.

When determining whether Appellant had a legal duty creating criminal liability, there must be: (i) an assumption of the duty to care for another, i.e. that Appellant voluntarily accepting the obligation to care for his father, and (ii) seclusion of that person, i.e. seclusion of the decedent.

(i.)    Assumption of Care

During trial, the jury was presented with evidence that as early as 2005, Appellant was involved in assisting his father with securing his healthcare and had his father at his home on a few occasions. There was a history of Appellant voluntarily providing some aid to his father. (N.T., 06/27/16, Vol. VI, p. 1118, l. 24 – p. 1119, l. 8, p. 1128, ll. 17-19, p. 1130, l. 5 – p. 1131, l.1, p. 1134, ll. 11-13, and p. 1135, l. 9 – p. 1136, l. 16).

In 2011, the decedent suffered a fall and was hospitalized at Our Lady of Lourdes Hospital in Camden, New Jersey. Appellant explained those events as follows:

GREEN:    Did there come a time when you learned that [the

decedent] had been hospitalized again?

GREEN: Yes.

GREEN: When was that?

[APPELLANT]: I believe that was in 2011 [at Lourdes].

(N.T., 06/27/16, Vol. VI, p. 1136, ll. 19-25).

GREEN: Did you participate in the discharge planning discussion with people at Lourdes?

[APPELLANT]: I did.

...

I discussed sub acute rehabilitation ["SAR"].

(N.T., 06/27/16, Vol. VI, p. 1140, l. 10 – p. l. 21).

The decedent was discharged from Our Lady of Lourdes Hospital to a SAR facility. The decedent remained at the SAR facility until his discharge on May 29, 2011. (N.T., 06/27/16, Vol. VI, p. 1142, ll. 16-19). Appellant testified to those events as follows:

GREEN: What did your father tell you he wanted as of May 25th?

[APPELLANT]: To go back to ... his home.

...

GREEN: Where did you take him?

[APPELLANT]: I took him to 184 Lawnside Avenue in Collingswood [N.J., his home].

...

GREEN: Did you leave him [at his home] the evening of May 29th, 2011?

[APPELLANT]: I did.

...

GREEN: ... [D]id you see your father on May 30th?

[APPELLANT]: I did.

...

GREEN:      Did you take [the decedent] from [his home] to [your
            home] on May 30, 2011?

[APPELLANT]:  I did.

(N.T., 06/28/16, Vol. VII, p. 1158, l. 10 – p. 1160, l. 1).

The circumstances of what happened after Appellant left his father at his Collingswood, NJ home on May 29, 2011 and when he returned on May 30, 2011 were described by the decedent's longtime friend, Mrs. Barbara Park, (N.T., 06/22/16, Vol. III, p. 539, ll. 5-8), who was present at the decedent's home on those two days:

YEN:        …[W]hen did you learn that [the decedent] had been
            discharged or removed from [the SAR] facility,
            [Cooper River]?

PARK:       When I got a phone call from [Appellant] telling me
            that his father was home.

YEN:        Well, tell the ladies and gentlemen as best as you can
            recall exactly what [Appellant] told you when he
            called you. … What exactly did he say?

PARK:       He took – I signed my father out and I took him home.

(N.T., 06/22/16, Vol. III, p. 550, ll. 15-24).

PARK:       I went over to [the decedent's] house.

            …

PARK:       … He said go to Wendy's for me. He was hungry.

YEN:        Did you go to Wendy's?

PARK:       I went to Wendy's. …

YEN:        Okay. And you brought Wendy's food back?

PARK:       Yes, I did.

YEN:        And then what happened?

PARK:       … [A] crash came at the front door. It was a
            Collingswood police officer wanting to talk to [the

decedent].

YEN: ... [W]hat happened next?

PARK: ... He said the nursing home said [the decedent] couldn't be alone. ... So I called [Appellant].

...

YEN: ... So what happened next?

PARK: ... [The] police officer ... said that [Appellant] was coming to get [the decedent].

YEN: So what happened next?

PARK: [Appellant] came about an hour later, got [the decedent].

(N.T., 06/22/16, Vol. III, p. 552, l. 7 – p. 554, l. 23).

Appellant testified that after taking his father to Appellant's home he became his father's primary caregiver. (N.T., 06/28/16, Vol., VII, p. 1252, ll. 1-3). In consideration of the evidence presented, a small portion of which is set forth above, we find that there was sufficient evidence to show, beyond a reasonable doubt, that Appellant decided to assume care for his father and that the decision was voluntarily made.

### (ii.) Seclusion

An additional factor the jury had to consider, relating to Appellant's legal duty to provide care to his father, is whether the decedent was secluded while under the Appellant's care. Considering the evidence presented at trial and after reviewing the record, we find there was sufficient evidence to show Appellant secluded his father from his friends, other family members, medical providers, and the general public. One of the decedent's most important relationships was with Mrs. Park. She testified as follows:

PARK: 'I knew [the decedent] for thirty years.

YEN: ... How did you meet [the decedent]?

PARK: Through the scouting program.

YEN: Was this the Boy Scouts?

PARK: Boy Scouts and Cub Scouts.

(N.T., 06/22/16, Vol. III, p. 539, ll. 5-14).


YEN: ... [W]ere there holidays during the years leading up to 2011 where [the decedent] spent holidays with you and your family as opposed to ... [the Appellant]?

PARK: He spent every holiday with me except Thanksgiving. He always went -- [Appellant] picked him up, took him to [the decedent's] brother's daughter's house for Thanksgiving every year.

(N.T., 06/22/16, Vol. III, p. 551, ll. 13-20).


Mrs. Park explained what happened in the spring of 2011 and thereafter, as follows:

YEN: ... Did there come a time in spring of 2011 when [the decedent] had an accident at home?

PARK: Yes. ... I called to him and he yelled he was upstairs. He was laying on the floor. He tripped over a shoelace ... And 'cause his leg was twisted they took him to [Our] Lady of Lourdes Hospital in Camden.

YEN: Did you go see him at the hospital ...?

PARK: I was there every day.

YEN: Did there come a time when he was transferred to a rehabilitation facility, Cooper River?

PARK: Yes.

(N.T., 06/22/16, Vol. III, p. 547, ll. 4-21).


YEN: ... [H]ow long was your friend [the decedent] at Cooper River West?

| PARK: | Couple of weeks. Not long. |
|---|---|
| YEN: | Did you go see him there? |
| PARK: | Every[]day. |
| YEN: | And when did you learn that he had been discharged or removed from that facility? |
| PARK: | When I got a phone call from [Appellant] telling me that [the decedent] was home. |

(N.T., 06/22/16, Vol. III, p. 550, l. 11 – 18).

Mrs. Park went on to describe the decedent's decades of dedication to the Boy Scouts and Cub Scouts, and how important the decedent's activities and involvement with the Boy Scouts and Cub Scouts were to him:

| YEN: | … When was it, …, when you encountered [the decedent] for the first time in context of the scouting activities? |
|---|---|
| PARK: | About 1974. |
| YEN: | Okay. What was he doing with the scouts back in or about 1974? |
| PARK: | He was a den leader, he was troop committee. … |
| YEN: | Okay. During the years leading up to 2011 did [the decedent] continue with his scouting activities? |
| PARK: | Yes, he did. |
| YEN: | And tell us what things … he did … leading up to 2011. |
| PARK: | Every Sunday night we had a meeting with the Cub Scouts for Pack 001. He was the den leader and assistant cub master. He would teach the boys knots, teach them about camping and the great outdoors. He also was on the troop committee which [] met once a month, planned all activities for all the Boy Scouts in |

the State of New Jersey.

YEN: How important was scouts to [the decedent]?

PARK: That was half of his life.

(N.T., 06/22/16, Vol. III, p. 540, l. 7 – p. 541, l. 2).


Mrs. Park also described how involved the decedent was in the VFW.

YEN: What was the other half [of the decedent's] life?

PARK: VFW Post American Legion.

YEN: Which post was [the decedent] a member of during the time that you knew him?

PARK: Tatem-Shields American Legion Post 17 Collingswood.

YEN: What were his activities ... with the VFW Post ...?

PARK: He was their assistant leader there and he was on their committee. He planned their picnics and any outdoor activities that they did. He would go to Veterans in Vineland, visit different members and take them different things that they needed.

(N.T., 06/22/16, Vol. III, p. 541, ll. 3-15).

Mrs. Park considered the decedent to be family. She testified as follows:

YEN: Did you and your husband take [the decedent] to social events?

PARK: Every social event that there was in scouting and otherwise.

YEN: Over what period of years were you and your husband taking [the decedent] to scouting events because he enjoyed going to them?

PARK: From 1998 to 2011. Night before he was taken to the hospital [in 2011] we were at a scouting event.

...

PARK: He loved being there. He loved being around people

and talking.

(N.T., 06/22/16, Vol. III, p. 544, l. 18 – p. 545, l. 6).

As stated earlier, Mrs. Park was there on May 29, 2011 to witness the decedent's first night back in his home after the fall. She also witnessed him leaving with Appellant on May 30, 2011. Knowing that the decedent treasured his contact with friends, she testified that along with the clothing and medicine she gave to Appellant to take for his father, she also gave Appellant the decedent's address book and told Appellant to make sure that the decedent called everybody to inform them of what was happening. (N.T., 06/22/16, Vol. III, p. 554, l. 23 – p. 555, l. 14). That did not happen. Appellant testified that during the two years he cared for his father he never took his father back to New Jersey to visit with friends, or anywhere else. (N.T., 06/28/16, Vol. VII, p. 1202, l. 18 – p. 1204, l. 23).

Mrs. Park testified that she made several attempts to contact the decedent and Appellant after May 30, 2011. She testified as follows:

YEN:     And did you try to see [the decedent]?
PARK:    I called. I went up there once, knocked on the door,
         got no answer.

(N.T., 06/22/16, Vol. III, p. 556, ll. 7-9).

PARK:    I ... banged on the door. Neighbor told me nobody
         was home. It was a Sunday. I figured I would catch
         [the decedent] home from church because he went to
         church every Sunday.

(N.T., 06/22/16, Vol. III, p. 558, ll. 20-23).

YEN:     Let's talk about your calls. Did you call [Appellant]?
PARK:    Left messages. I got through one time to him.

| YEN: | How many times did you leave messages trying to get a hold of … [the decedent]? |
| --- | --- |
| PARK: | Plenty of times. |
| YEN: | When you did speak with [Appellant] that one time was that when he returned [a] call or were you just lucky? |
| PARK: | I was lucky. |
| YEN: | Did [Appellant] ever return any of your calls? |
| PARK: | No. |
| YEN: | Did you know where your friend [the decedent] was, whether or not he was in a nursing home, with his son in his son's home in West Chester or somewhere else? |
| PARK: | No, I didn't know where he was. |

(N.T., 06/22/16, Vol. III, p. 556, ll. 10-24).

Mrs. Park also testified about her efforts to arrange for the decedent to go with her to the annual Boy Scouts event, the "Old Timer Weekend" in Maryland. The decedent attended this particular event for more than ten years. It was an event he loved because it offered him the opportunity to see old friends in person. Her recollection of why the decedent did not attend in November 2011 was described as follows:

| PARK: | I told [Appellant] I wanted to come pick his father up for Old Timer Weekend in Maryland. We went every year in November. It's a three day event. Scouts from all over the world go. |
| --- | --- |
| | … |
| PARK: | And [Appellant] told me his father had diarrhea, he couldn't go. I said but its two weeks from now. |

[Appellant] said his father could not go.

(N.T., 06/22/16, Vol. III, p. 557, ll. 8-15).

When questioned about his father's desire to continue contact with Mrs. Park and his Boy Scouts and Cub Scouts activities, or the VFW Post American Legion activities, Appellant testified his father did not express any desire to continue those activities after May 2011 when he came to live with him. (N.T., 06/28/16, Vol. VII, pp. 1202-1207). Appellant acknowledged that his father did enjoy doing those activities prior to May 2011.

It was the Commonwealth's position that Appellant's representation of the decedent's lack of interest in the Boy Scouts, the VFW, Mrs. Park, and religious services was a fabrication presented by Appellant to justify his father's isolation. We note that Appellant testified that he and his partner drove to his father's house on a regular basis to pick-up his father's mail but never took his father anywhere. (N.T., 06/28/16, Vol. VII, p. 1275, l. 18 – p. 1276, l. 3). Appellant did not file a change of address with the post office to place others on notice that the decedent was no longer residing in New Jersey. This prevented the general public from tracing the Appellant's whereabouts.

There was no indication that the decedent's connections with people relating to his medical care or social life were of any concern to Appellant once the decedent was living in Appellant's home, where he remained for the last two and a half years of his life. Appellant testified that he spoke to his own doctor, Dr. Dwight Johnson, about the decedent and had listed Dr. Johnson as the decedent's primary care physician when a name was requested by medical providers. (N.T., 06/28/16, Vol. VII, p. 1181, ll. 15-17, 1235, ll. 8-9; Def. Exh. D-23, D-24). However, the decedent was never seen by Dr.

Johnson and Appellant never requested that his father's medical records from his doctors in New Jersey be transferred to Dr. Johnson.

After the October 2011 Chester County Hospital visit, pursuant to the doctor's referral, Appellant called Brandywine River Valley Home Health and Hospice ("Brandywine River Valley"). The evidence related to the home health care visits was presented to the jury through the testimony of the nurses who worked for Brandywine River Valley and whose notes about efforts to contact and treat the decedent were contained in the decedent's file. Those nurses were: Christine Magorry, Tyler Wilson, Debra Allen, Patricia Boyer, and Barbara Harvey.

Nurse Magorry testified that in October and November of 2011 she was employed by Brandywine River Valley as a registered nurse where she worked providing home health care services. (N.T., 06/21/16, Vol. II, p. 310, ll. 9-21, 24-25). Nurse Magorry's duties included going to patient homes after their release from a hospital and she often performed assessments. (N.T., 06/21/16, Vol. II, p. 311, ll. 8-12). Part of her testimony was as follows:

> MAGORRY: [Brandywine River Valley] gets a referral from the hospital that a patient's coming home. And my office notifies one of the nurses to go out, do a history, physical, home health assessment to see what their needs are, to see what medications they are taking, and to try to keep them at home, keep them out of the hospital.

(N.T., 06/21/16, Vol. II, p. 311, ll. 15-20).

Nurse Magorry did an assessment of the decedent on October 22, 2011, after he

was discharged from Chester County Hospital's emergency room.[9] Nurse Magorry's records reflect the following information:[10]

1. She met with both the decedent and Appellant at Appellant's home on Saturday, October 22, 2011.

2. The decedent signed a consent form to receive treatment and benefits from Brandywine River Valley.

3. The decedent acknowledged that he had a right to refuse treatment or terminate services at any time by notifying Brandywine River Valley.

4. The treatment schedule was for three visits the first week, two visits per week for three weeks after that, and one visit per week for four additional weeks.

5. The decedent signed all of the documents presented to him without objection.

(N.T., 06/21/16, Vol. II, p. 314, ll. 8 – p. 315, l. 18, pp. 316-320; Comm. Exh. C-16(C)).

After the paperwork was completed, Nurse Magorry physically examined the decedent. Her findings are reflected in Commonwealth's Exhibit C-16(B), as follows:

1. The decedent's primary care physician is noted as Dr. Dwight Johnson.

2. The decedent is totally dependent in the area of managing finances.[11]

3. The decedent is noted to be bowel and bladder incontinent both day and night, four to six times weekly.

---

[9] On October 19, 2011, the decedent complained of heart attack symptoms and the Appellant took the decedent to Chester County Hospital's emergency room. (Comm. Exh. 14 *et seq.*).
[10] Nurse Magorry had no independent recollection of the actual assessment. The events of that day are documented in her records. (N.T., 02/21/16, Vol. II, p. 312, ll. 15-24; Comm. Exh. C-16(C)).
[11] Prior to May 2011, the decedent depended on his friend Mrs. Park to assist him with his banking. He always dealt in cash or check. The decedent was getting pension checks directly deposited into his bank account every month. The monthly pension of $2,800 would have been sufficient to cover the decedent's care at the V.A. nursing facility. (N.T., 06/22/16, Vol. III, p. 577, ll. 15-25; N.T., 06/23/16, Vol. IV, p. 759, l. 25 – p. 760, l. 8; N.T., 06/22/16, Vol. III, p. 523-525).

4. The decedent is noted as being homebound.

5. The decedent is noted as needing assistance for all activities, including: personal grooming, dressing, and bathing. The decedent is able to do some washing at a sink or commode with supervision. The decedent is unable to use the toilet alone. The decedent is able to move from the bed to a chair, and vice versa, with minimum assistance or use of an assistance device.

6. The decedent requires a two-handed device to walk and assistance in managing stairs, steps, and uneven surfaces.

7. The decedent is unable to prepare any meals for himself.

8. The decedent is able to answer the phone and converse but has difficulty dialing a phone to place calls.

9. The information given indicates the decedent is compliant with his medication regimen. Compliance is dependent upon the decedent being reminded at the appropriate time.

10. Certain hazards in the Appellant's home are noted: stairs, clutter, soiled living areas.

11. The decedent weighs 167 pounds.

12. The decedent signed the results of the physical assessment and no objections or refusals were made by the decedent.

13. Appellant provided his contact home, work, and cell phone numbers

(N.T., 06/21/16, Vol. II, pp. 322 - 333, p. 334, l. 24 – p. 335, l. 3, p. 340, l. 24 – p. 341, l. 3; Comm. Exh. C-16(B)). Nurse Magorry explained that the services to which the decedent consented would provide the decedent and Appellant with assistance and education on how to keep the decedent clean and comfortable during periods of

incontinence. They would also encourage the decedent to move around to lessen the risk of developing ulcers or bedsores. (N.T., 06/21/16, p. 346-347). Nurse Magorry had no further contact with the decedent after October 22, 2011. (N.T., 06/21/16, Vol. II, p. 341, II. 4-7).

The second nurse assigned by Brandywine River Valley to see the decedent was Tyler Wilson. Nurse Wilson testified that when a new patient had been placed on her list for care she would call to set up an appointment. If the patient could not be reached after multiple attempts at calling she would go knock on the door. (N.T., 06/22/16, Vol. III, pp. 478 - 480).

Like Nurse Magorry, Nurse Wilson did not have an independent recollection of her efforts to gain access to the decedent in order to provide services and treatment. All the information she gathered is reflected in her file notes. (N.T., 06/22/16, Vol. III, pp. 481, l. 7 – p. 482, l. 15; Comm. Exhs. C-16(F), C-16 (G), C-16(J)). The records reflect the following:

1. On October 25, 2011, she called the decedent, using the contact information given, and services for that day were refused. She does not note if those services were refused by the patient, the decedent, or someone else.[12] The visit was rescheduled for Wednesday, October 26, 2011.

2. Nurse Wilson attempted to make contact again on October 26, 2011, and services were refused. There is no notation as to whether it was the decedent or Appellant who refused services.

3. Another attempt for contact was made by a different nurse on Thursday,

---

[12] We note that according to the testimony, the decedent did not have access to any telephone since he was restricted to his bedroom where there was no phone, and he had no cell phone.

October 27, 2011.

4. Nurse Wilson attempted again to make contact on the following Thursday, November 3, 2011 and knocked on Appellant's house door, it was locked. There was no response. She rescheduled for another contact attempt to be made on Monday, November 7, 2011.

5. The decedent was discharged from care by Brandywine River Valley by Nurse Wilson on Thursday, November 10, 2011. The primary care physician was to receive notice of the discharge due to noncompliance with home visits and refusals of care. Appellant is noted as indicating to one of the nurses that the decedent was independent and refused visits.

(N.T., 06/22/16, Vol. III, pp. 482 – 490; Comm. Exhs. C-16(F), C-16 (G), C-16(J), C-16(K)).

Three additional Brandywine River Valley nurses testified to their attempts to contact the decedent. Like the previous nurses, Debra Allen testified that she had no independent recollection of her efforts to contact the decedent, but the documents in his file show her activity. She went on to testify that she was the clinical supervisor in October and November of 2011 for Brandywine River Valley. (N.T., 06/22/16, Vol. III, p. 581, I. 16 – p. 582, I. 4). Nurse Allen testified she was responsible for reviewing each assessment prepared on a new patient for completeness. She testified she reviewed the decedent's plan of care as prepared by Nurse Magorry on October 22, 2011. (N.T., 06/22/16, Vol. III, pp. 584 – 587; Comm. Exh. 16(d)).

Barbara Harvey testified that she was also a nurse with Brandywine River Valley during October and November of 2011. She testified that she attempted to contact the decedent to set up a home visit. She made her attempt on

Thursday, October 27, 2011. Her records reflect that she called using the patient's contact information to notify the patient she was coming. When there was no answer on the phone, she drove to Appellant's home and knocked on the door. There was no answer at the door, so she called again to say she was waiting outside. Again, there was no answer on the phone, so she left the residence and made a note that the visit was missed in the records. She left a voicemail to try to reschedule the visit. (N.T., 06/24/16, Vol. V, pp. 826-830).

Upon examination by the Commonwealth, Nurse Boyer testified that she has no independent recollection of her efforts to reach the decedent, but her activities are recorded in the decedent's file. The records reflect that she spoke with Appellant on Sunday, October 30, 2011, to set up a home visit for the decedent. At that time, Appellant refused services unless they were taking place on Saturdays after 11:30 a.m. A visit was scheduled for Saturday, November 5, 2011 after 11:30 a.m. (N.T., 06/23/16, Vol. IV, p. 705, l. 15 – p. 710; Comm. Exh. 16-(i)).

The testimony from Brandywine River Valley nurses and their records showed that there was no home visit for Saturday, November 5, 2011; and attempts to reschedule the following week were unsuccessful. The decedent's file was closed on Thursday, November 10, 2011 due to non-compliance. There is no evidence that the Appellant followed-up with Brandywine River Valley as to why a nurse did not come to the scheduled Saturday visit of November 5, 2011. Brandywine River Valley was the only home health care agency contacted by Appellant to evaluate and care for the decedent. Appellant never requested a physician come to his home for a "house call" to treat his father. (N.T. 06/28/16, Vol. VII, p. 1240, ll. 1-17).

The Commonwealth presented voluminous records tending to show that the

decedent went to the doctor quite regularly prior to May 2011. In the last several years, Mrs. Park had taken the decedent to his doctor visits. The records also showed that the decedent had a regular medication regimen, although his compliance was not perfect.[13] It was the Commonwealth's position that the refusal to accept nursing services from Brandywine River Valley reflected Appellant's wishes, not the decedent's. Only one nurse actually spoke with the decedent, Nurse Magorry, and the decedent was noted to be very cooperative and accepting of nursing care. Examining the evidence in the light most favorable to the Commonwealth, it is reasonable to conclude that it was Appellant's decision to refuse outside medical services that would likely have been extremely helpful and beneficial to the decedent.

Other possibilities for interaction between the decedent with persons outside Appellant's home were non-existent. When left alone the decedent was limited by his lack of mobility. He was not able to descend the stairs to the first floor of Appellant's residence without substantial assistance. Consequently, even when accompanied at home, the decedent was limited by the willingness of Appellant or Samir Rashid, Appellant's life partner, to take the decedent downstairs to the first floor or outside to the porch area of the front yard at Appellant's house, which they never did. (Comm. Exh. C-1(A), C-2). Appellant stated that the decedent never left the house after May 30, 2011 except for two instances: once when the decedent went to Chester County Hospital's emergency room and once when the decedent was alone and managed to get downstairs and outside to a neighbor's house. (N.T., 06/28/16, Vol. VII, p. 1281 ll. 11-

---

[13] The decedent had a primary care physician from 1977 through his hospitalization at Our Lady of Lourdes Hospital. *See* N.T., 06/22/16, Vol. III, p. 405, l. 25 – p. 409, l. 1; Comm. Exh. C-9 *et seq.*; Comm. Exh. 9 (C-D).

19). Appellant's testimony of the circumstances surrounding the visit to the emergency room in October 2011 was as follows:

> GREEN: Did there come a time in October of 2011 when your father asked for medical help?
>
> [APPELLANT]: Yes.
>
> GREEN: How did he ask? What came of his request?
>
> [APPELLANT]: [Mr. Rashid] and I took him to the Chester County Hospital at four in the morning.
>
> GREEN: Why did you do that?
>
> [APPELLANT]: Because approximately an hour before that he wakened both of us and said he thought he was having a heart attack.
>
> GREEN: Did he have any symptoms that sounded like a heart attack?
>
> [APPELLANT]: I asked him was he having chest pain. He said no. I asked him was he having shortness of breath. He said no. I asked him did he have pain radiating down his left arm. He said no. I observed him and I did not see, for example, that he was sweating. I asked him where was the pain and he said it was in his chest. So that's what the dialogue was between my father and me initially.

(N.T., 06/28/16, Vol. VII, p. 1162, l. 16 – p. 1163, l. 8).

In spite of the above testimony to the jury, that wasn't the only dialogue between the decedent and Appellant that night. The Appellant stated during his interview with the detective on September 8, 2013 that he made the following additional statements to the decedent:

EB:     "Okay, here's what I'm gonna do. I'm gonna go and get you a couple of aspirin out of the medicine cabinet."

...

"I'm gonna give you some water. You're gonna take them. I'm gonna come back in an hour and if you're still having whatever this discomfort is, we'll get you in the car and we'll take you to the emergency room."

(Comm. Exh. 30(a), p. 16, ll. 32-40).

The next and only other time the decedent left Appellant's house was in the spring of 2012 when Mr. Rashid went out to get cigarettes and the decedent was home alone. (Comm. Exh. C-30(A), p. 6)). Appellant's neighbor, Amanda Wyatt, described what she observed as follows:

GREEN:   Did you have occasion to meet [the decedent]?
WYATT:   I did. Yes, sir.
GREEN:   How long before the [decedent] passes away was the time when you met the [decedent], had conversation?
WYATT:   ... I want to say [the] spring of the year before he passed. He locked himself out of the house and he came over, asked me to call him a cab.

(N.T., 06/29/16, Vol. VIII, p. 1325-1327).

WYATT:   ... [H]e was wearing a tee shirt, adult diaper. He had a cane.

(N.T., 06/29/16, Vol. VIII, p. 1331, ll. 15-16).

Appellant and Mr. Rashid left the decedent home alone often, either when they both went to get the decedent's mail in New Jersey – a two hour trip – or out

to eat. (Comm. Exh. C-14(B), p. 1 (Social History); Comm. Exh. 30(a), pp. 36-38). Even on the morning of his father's death, Appellant and Mr. Rashid went out for breakfast at the West Chester Diner and left the decedent home alone. (Comm. Exh. 30(a), p. 40). The decedent was also left alone during the week days when Mr. Rashid was deployed to Guantanamo Bay for six months. Appellant testified he would come home to feed the decedent lunch. (N.T., 06/28/16, Vol. VII, p. 1167, ll. 3-20, p. 1170, ll. 1-8). During his time alone in the house, the decedent did not have access to a phone or a cell phone.[14] These facts are relevant to determine if the decedent had access to the outside world and *vice versa*.

The Commonwealth proposed that the evidence showed the decedent was secluded by Appellant. Appellant proposed through his testimony and that of Mr. Rashid that the decedent chose to be alone, refusing contact with others, especially doctors and nurses. Appellant also indicated his father never asked to see Mrs. Park or his other friends. However, there is no indication that the decedent was ever given that option. The jury was required to evaluate this contradictory evidence. In an analysis for the sufficiency of the evidence, we do not reconcile contradictory evidence, but must determine whether a reasonable person viewing all of the evidence, taken as a whole in the light most favorable to the Commonwealth, could find beyond a reasonable doubt that Appellant secluded his father from others who could have provided aid.

---

[14] At no time during his stay with Appellant did the decedent have access to a phone in his bedroom or a cell phone. We also considered the evidence that the decedent needed assistance placing regular calls (N.T., 06/28/16, Vol. VII, p. 1280, ll. 1-3; Comm. Exh. 16(b), p. 11), and that Appellant testified that even with access to a cell phone his father did not know how to use one. (N.T., 06/28/16, Vol. VII, p. 1280, ll. 15-20). There was no manner in which the decedent could reach out for help.

The Commonwealth's evidence shows that on May 30, 2011 the Appellant took the decedent from the life he enjoyed in New Jersey to Appellant's home in Chester County, Pennsylvania. At this new location, the decedent had no access to a phone, even when he was left alone for long periods of time. The decedent had no access to friends and other family, even though Appellant knew that Mrs. Park wanted to keep in touch with the decedent and wanted to continue to have the decedent participate in Boy Scouts and Cub Scouts events. The decedent never went to another Thanksgiving with his brother's family, something he did every year until he began living with Appellant in November 2011. The decedent was never taken to church, though there was testimony that the decedent had previously attended weekly, and Appellant also testified to attending Mass. The Appellant made no attempts to have the decedent examined by a doctor or to continue his medication regimen even though the decedent never refused medical care from his prior doctors, at any hospital, or during his stay in the rehabilitation facility. Looking at all of the evidence presented, in the light most favorable to the Commonwealth, we find it was reasonable for the jury to conclude beyond a reasonable doubt that Appellant secluded his father from those who could provide aid.

B.    Appellant's Failure to Act Was Not the Legal
      Cause of Death and/or Other Harm to the Decedent

Appellant alleges that the evidence presented at trial was insufficient to establish, beyond a reasonable doubt that any act, or failure to act, by Appellant was the legal cause of death and/or other harm to the decedent. The Commonwealth presented one expert on the issue of causation, Ian Hood, MD, the medical examiner who performed the autopsy on Edward O'Brien, Jr. The autopsy was completed the day after the decedent's death and a report was completed on September 11, 2013. (N.T., 06/24/16,

Vol. V, p. 898, p. 908, II. 20-24; Comm. Exh. C-21). Dr. Hood testified to his education and professional experience. The Commonwealth moved for the qualification of Dr. Hood as an expert in forensic pathology, Appellant did not object and the motion was granted. (N.T., 06/14/16, Vol. V, p. 904, I. 21 – p. 905, I. 3; p. 907, II. 22-25).

Appellant claims that Dr. Hood's testimony was insufficient to show that the decedent's death resulted from any omission or failure to act on Appellant's part. Dr. Hood's opinion as to causation addresses two aspects of the decedent's condition at the time of his death. First, Dr. Hood opined that the decedent's cause of death was congestive heart failure contributed to by infected decubiti, or bedsores, which placed an extra strain on the decedent's system. Dr. Hood explained that the decedent's cardiac health was very good except for the hardening of the heart walls that may be expected to be seen in an individual the decedent's age and with his history. He opined that the decedent had remarkably good organ function, and did not seem to have any other medical problems.

Dr. Hood explained the physical events that lead to congestive heart failure and indicated that a regular medication regimen of Lasix would have placed the decedent's heart back to normal function. (N.T., 06/24/16, Vol. V, p. 918, I. 21 – p. 922, I. 14). Lasix or furosemide was the medication for which the decedent had received many prescriptions prior to living with Appellant, and was one of the prescriptions he received on two occasions from two doctors while in the care of Appellant, after his discharges from Cooper River and Chester County Hospital.[15] The decedent's medication regimen had improved his cardiac function in the past which is probably why it had been

---

[15] *See* N.T., 06/22/16, Vol. III, p. 409, II. 11-18, p. 410, II. 12-18, p. 413; N.T., 06/23/16, Vol. IV, p. 631, I. 3 – p. 632, I. 5; Comm. Exh. C-8(G-I), C-8(O), C-14 (I)).

continually prescribed over the years. (N.T., 06/22/16, Vol. III, p. 417, ll. 3-12). Without the medicine, the decedent's lungs would have filled with fluid and the decedent would have become progressively hypoxic, that is he would have suffered from a lack of oxygen, leading to terminal cardiac arrhythmia. This would result in a sudden death and would look like the circumstances explained by Appellant on September 8, 2013. (N.T., 06/24/16, Vol. V, p. 919, l. 2 – 7).

The second aspect of Dr. Hood's opinion as to causation was the infection in the decedent's bedsores. Dr. Hood explained that he swabbed the areas of the bedsores, examined the swabs and found those samples showed growing organisms. He also testified that he tested the decedent's blood and that those same organisms were found in the decedent's blood stream. This infection placed an added stress on the decedent's system contributing to his death. (N.T., 06/24/16, Vol. V, p. 922, l. 11 – p. 925, p. 928, ll. 1-2; Comm. Exh. C-21(B)).

Appellant claims that Dr. Hood's opinions are insufficient to prove beyond a reasonable doubt that it was Appellant's omissions or failure to care for his father that caused the decedent's death. However, Dr. Hood opined that it was the omission of continued medication which caused the decedent to suffer congestive heart failure and that the infection from the multiple bedsores that contaminated his blood caused stress upon the decedent's heart leading to sudden arrhythmia and death. Dr. Hood explained that it was the infection from the bedsores that pushed the decedent's condition towards a sudden death. It was up to the jury to consider whether to accept Dr. Hood's opinion as to causation.

Appellant testified that the bedsores did not begin to occur until four weeks prior to death. Dr. Hood agreed that the bedsores he examined were approximately that old.

He added, however, that the decedent should not have been at high risk for bedsores. The decedent did not suffer from paralysis or neurological conditions which would have kept him from altering his position or prevented him from feeling discomfort that would have caused the decedent to change his position. (N.T., 06/24/16, Vol. V, p. 912-913). The reasonable inference is that the continued untreated congestive heart failure made it harder to get oxygen into the lungs decreasing the decedent's mobility. In turn, this decreased mobility caused bedsores.

The development of bedsores is not what directly caused the decedent's death. It was the lack of daily hygienic care of the decedent's body which allowed urine and feces to infect the wounds and eventually allowed the spread of the infection to the decedent's blood. (N.T., 06/24/16, Vol. V, p. 919-920). With proper attention to the decedent's cleanliness and proper attention to avoiding bedsores with movement and padding of those areas, the decedent's heart would not have been stressed to the point of an irregular arrhythmia and sudden death. (N.T., 06/24/16, Vol. V, p. 919-921, 928).

The deplorable condition in which the decedent was found was noted by Dr. Hood. The decedent's body was covered in keratitic debris; a build-up on the skin due to a lack of washing that is seen as a brown hue on the skin. The decedent's body was also covered head to toe in feces and urine. There were numerous and extensive bedsores that looked three to four weeks old. (N.T., 06/24/16, Vol. V, p. 911; Comm. Exh. C-6, C-6(A)). Those factors were conducive to the spreading of infection.

Dr. Hood's testimony regarding the condition of the decedent's body was corroborated by the first responders to the 911 call made by Appellant on September 8, 2013. They testified that the condition of the decedent's room was nauseating. The first

officer on the scene, Detective Michael J. Buchmann described what he found as follows:

> BUCHMANN: I'm a detective with the West Whiteland Township Police Department.

(N.T., 06/21/16, Vol. II, p. 235, ll. 14-15).

> BUCHMANN: I was dispatched to 936 Hollyview Lane for report of a cardiac arrest.

(N.T., 06/21/16, Vol. II, p. 237, ll. 15-16).

> BUCHMANN: [The decedent] was lying on the floor.
>
> ...
>
> BUCHMANN: He was wearing a white tee shirt or white undershirt.
>
> YEN: Was her wearing anything on his bottom half?
>
> BUCHMANN: No.

(N.T., 06/21/16, Vol. II, p. 251, ll. 2-7).

> YEN: Detective, when you entered the threshold of 936 Hollyview Lane did you detect any noticeable odors or aroma?
>
> BUCHMMANN: I did. There was a foul smell of what I believed to be human feces.
>
> YEN: ... [W]hen you entered the residence from the sidewalk ... did you perceive an aroma or a smell at that point?
>
> BUCHMANN: Not as strong as in the [decedent's] room but I did, yes.
>
> ...

YEN:                 … [H]eading to the bedroom where [the decedent] was found deceased how strong was the odor of human waste?

BUCHANNAN:           It was very strong, very overbearing.

                     …

BUCHMANN:            To the point where you could only spend a few moments in there, few minutes before having to leave to take a fresh breath of air or breath of fresh air.

(N.T., 06/21/16, Vol. II, p. 254, l. 13 – p. 255, l. 8).

The pictures entered into evidence depicting the decedent's bedroom showed pervasive filth. (Comm. Exh. C-4, C-4(A), C-4(B)). Detective Buchmann observed dried feces on the decedent's box spring, the carpet in decedent's bedroom, the wooden chair in the bedroom, and on the bedroom furniture. (N.T., 06/21/16, Vol. II, p. 258, l. 16 – p. 259, l. 4). There was no area in the decedent's bedroom that was clean.

Jeffrey McCloskey, another responding West Whiteland Police Detective who has previously worked as an EMT made similar observations. (N.T., 06/24/16, Vol. V, p. 846, ll. 16-20, p. 848, ll. 15-18, p. 849, ll. 9-10). He too immediately smelled the odor of urine and feces upon entering the Appellant's house. The odor got stronger when he climbed the stairs to the second floor. When he stepped into the decedent's bedroom the odor became overwhelming. He had to start breathing through his mouth which caused him to gag. (N.T., 06/24/16, Vol. V, p. 849, ll. 20-21, p. 850, ll. 6-15). Detective McCloskey described the scene in the decedent's bedroom as follows:

MCCLOSKEY:        [The decedent] was laying on his back, ... on the floor with only a tee shirt on. ... He was naked from the waist down. ... His skin was - -appeared very dehydrated. ... He had black sores, ulcers throughout his body. Ankles were pretty much black, heels, his toes. Right side of his hip had a large ulcer, black marks on it.

                         ...

MCCLOSKEY:        ... You could see some feces hanging from the inside of his groin. Just the body itself just looked - - ... he did not look very clean at all.

                         ...

MCCLOSKEY:        There was a bed - - bed, box spring which was completely filthy. There were basically blood, it appeared to be feces, urine, you know, on the box spring like somebody had gone to the bathroom, just ran down the side of the box spring onto floor. The floor, carpet appeared to be the same way, you know, there was urine, feces smell and appeared to be dried urine, feces, blood on the floor, on the bed, on the bed frame, box spring, chair.

                         ...

MCCLOSKEY:        Night stand had also some blood or dried feces on it, some type of splatter. Sheets and blanket on top also had some type of, you know, stains on it.

(N.T., 06/24/16, Vol. V, p. 850, l. 22 – p. 853, l. 11).

During Appellant's testimony he admitted that although his father was bladder and bowel incontinent, and did not wear a diaper, and that the bed linens

and the decedent's t-shirt were only changed two to three times a week. (Comm. Exh. C-30(A), pp. 24-25, p. 42). Bearing in mind the evidence of the condition of the decedent's body, the condition of the decedent's living area, and the lab results showing an infection in the decedent's bedsores and in his blood, it can be inferred that the cause of death was congestive heart failure exacerbated by the infection in his blood from the infected bedsores. It is reasonable to infer that this condition was the direct result of the unsanitary and unhygienic conditions in which the decedent was left while in Appellant's care. The Appellant stated he knew he had to do something but had not decided what to do. (Comm. Exh. C-30(A), p. 21-22). The point in this case is that he didn't do anything and his father was left in a considerably worse condition as a result.

The jury was instructed to determine whether the evidence presented proved the element of causation beyond a reasonable doubt for the Third Degree Murder charge. Examining the evidence in the light most favorable to the Commonwealth, and considering Dr. Hood's opinion that but for the Appellant's failures to care for his father in continuing the medications he had been previously prescribed, and keeping the decedent clean and minimally mobile, the decedent would have likely lived a much longer life, we find there was sufficient evidence for the jury to find that the Commonwealth proved causation beyond a reasonable doubt relating to the Murder of the Third Degree charge and the other personal injury charges.

VIII.    Jury Instruction – Affirmative Defense

Appellant sets forth an objection to the court giving an affirmative defense instruction to the jury in violation of Appellant's constitutional rights. (*See* Appellant's

Concise Statement, 11/01/16, p. 1, par. 3). We address this objection in two parts. The first is whether it was a violation of both State and Federal Constitutions to have any burden of proof assigned to Appellant for an affirmative defense. Appellant alleges that our instruction relieved the Commonwealth of its burden to prove every element of the crimes charged beyond a reasonable doubt. The second is whether it was error to give the specific affirmative instruction as it was in this case.

Generally speaking, when reviewing a jury instruction for reversible error, the entire instruction must be read as a whole to determine if it provided a fair and complete statement of the law. *Commonwealth v. Jones*, 683 A.2d 1181 (Pa. 1996); *Commonwealth v. Spell*, 28 A.3d 1274 (Pa. 2011). Only when a clear abuse of discretion or an error of law affecting the outcome of the case is found, can there be determined to be reversible error. *Commonwealth v. Montgomery*, 687 A.2d 1131 (Pa.Super. 1996); *Commonwealth v. Brown*, 987 A.2d 699 (Pa. 2009), *cert. denied*, 131 S. Ct. 76 (2010).

A.      Affirmative Defense Instruction Appropriate

We first examine Appellant's claim that it was error to assign the burden of proof for an affirmative defense to Appellant at all because it relieved the Commonwealth of its burden to prove all the elements of the crimes charged beyond a reasonable doubt. We disagree. The jury was repeatedly instructed, in the general instructions and as the instruction for each crime was given, that the Commonwealth bore the burden of proving every element of each crime beyond a reasonable doubt. They were also repeatedly instructed that the Appellant bore no burden with respect to the crimes charged. (N.T., 06/29/16, Vol. VIII, p. 1528, ll. 4-12, p. 1529, ll. 10-13, 17-21). It was made clear that if they found the Commonwealth failed to meet its burden of proof on

any element of any of the charges that they should find Appellant not guilty. (N.T., 06/29/16, Vol. VIII, p. 1528, ll. 13-14, p. 1539, ll. 10-13).

The appellate courts have consistently held that the burden of proving an affirmative defense that relieves the accused of criminal responsibility, but does not negate an element of the offense charged, may be placed on the defendant. *See* Pa.S.S.J.I.(Crim.), §2.10, (2016) Defenses-Assigning the Burden of Proof, Advisory Committee Note, *citing Commonwealth v. Collins*, 810 A.2d 698, 701, (Pa.Super. 2002); *Commonwealth v. Shenkin*, 487 A.2d 380 (Pa.Super. 1985). The general rule is that when the asserted defense may only be proven by "information that is peculiarly within the defendant's own knowledge and control, the ... defendant has the burden of proving the defense by a preponderance of the evidence. *See Commonwealth v. Rishel*, 658 A.2d 352, 355 (Pa.Super. 1995), *reversed on other grounds* 681 A.2d 162 (Pa.1996). Appellant testified at length about the decedent's communication of his wishes to Appellant. According to the testimony presented by Appellant and other defense witnesses, the decedent wished to remain in Appellant's home, did not want to be in a skilled nursing facility, and did not wish to receive medical care from visiting nurses whom he considered strangers. These conversations occurred between Appellant and the decedent. Some occurred in the presence of Appellant's partner, Mr. Rashid who also testified. (N.T., 06/27/16, Vol. VI, p. 1104, l. 23 – p. 1105, l. 16; p. 1108, ll. 23-25; N.T. 06/28/16, Vol. VII, p. 1252, l. 9-16; N.T., 06/29/16, Vol. VIII, p. 1365, l. 12 – p. 1366, l. 19).

Appellant's defense included the proposition that Appellant failed to get medical care for the decedent because the decedent refused any care. Obviously, the Commonwealth had no access to any evidence relating to the decedent's wishes other

than statements made by Appellant and the decedent's past medical history demonstrating the care he sought for himself. We found, and continue to find, that it was appropriate to give the jury an affirmative defense instruction.

Our instructions clearly and repeatedly stated that the Commonwealth maintained its burden to prove all of the elements of each crime beyond a reasonable doubt. In determining whether they believed the decedent refused medical care, thereby relieving Appellant of his legal duty to care for the decedent, the jurors made a credibility determination after hearing the recording of Appellant's interview with Detective Lund, and after hearing Appellant and other witnesses testify in court. The jury had only to find that it was more likely than not that there was a competent refusal of care by the decedent in order to return a verdict of not guilty on all counts. But, it was also made clear to the jurors that the Commonwealth maintained the burden of proof, beyond a reasonable doubt, in reference to all the elements of the crimes. Consequently, we find no error was made.

B.      Affirmative Defense Instruction Given in this Case

We next examine whether the specific instruction relating to the affirmative defense given in this case was appropriate. Our jury instructions did not place a burden on Appellant to show that he had "no duty." First and foremost, we instructed the jury that it was initially the Commonwealth's burden to prove beyond a reasonable doubt that Appellant had a legal duty to provide medical care to the decedent. We stated:

> COURT:      You cannot find the [Appellant] guilty ... based
>                     solely on failure to act **unless you are
>                     satisfied beyond a reasonable doubt that**

**the defendant had a legal duty to care for
the decedent.** ...

(N.T., 06/29/16, Vol. VIII, p. 1542, ll. 8-13)(emphasis added). The burden of proving,

beyond a reasonable doubt, that Appellant had a legal duty to care for his father was

assigned to the Commonwealth. This same instruction was given on every criminal

charge: Murder in the Third Degree, *Id.*, Involuntary Manslaughter, *see* N.T., 06/29/16,

Vol. VIII, p. 1542, l. 22 – p. 1543, l. 13), Aggravated Assault, *see* N.T., 06/29/16, Vol.

VIII, p. 1545, l. 24 – p. 1546, l. 17), and Recklessly Endangering Another Person, *see*

N.T., 06/29/16, Vol. VIII, p. 1548, ll. 1-5, 11-16).

We also gave an additional instruction related specifically to the lesser burden

being placed upon Appellant regarding his affirmative defense which required them to

make a finding of fact, by a preponderance of the evidence, relating to the decedent's

wishes to forgo medical care. We found that the facts in this case and the facts

contemplated by the statute relating to Neglect of Care-Dependent Person, 18

Pa.C.S.A. § 2713 are very similar. Accordingly, we used the suggested standard

instruction governing Neglect of Care-Dependent Person, *Id.*, as a template for our

instruction. Specifically, we used the portion of the Neglect of Care-Dependent Person

that sets forth the affirmative defense. Pa.S.S.J.I. (Crim), §15.2713 (2016)(Neglect of

Care-Dependent Person). The §15.2713 affirmative defense instruction states:

> The defendant has asserted that the conduct otherwise
> charged in this case resulted directly from:
> > a. ... compliance with a care-dependent person's
> > living will for health care ...; or
> > b. ... compliance with the care-dependent person's
> > written, signed, and witnessed instructions,

executed when the care-dependent person was competent as to the treatment he or she wished to receive; or

   c.  ... compliance with the direction of the care-dependent person's ... power of attorney ... within the scope of that power; or

   d.  ... compliance with a [DNR] order ... by ... attending physician; ...

The defendant bears the burden of proving to you by a preponderance of the evidence that the conduct resulted from one of these circumstances. If you find that the defendant has shown you that it is more likely than not that such circumstances did exist and did result in the conduct charged, you should find the defendant not guilty. Otherwise, if all of the elements as I have explained them have been proven beyond a reasonable doubt, you should find the defendant guilty.

We gave the following instructions:

COURT:   In this case the defendant has asserted what is called an affirmative defense claiming his conduct was a result of the decedent's wishes to forgo medical care. The defendant bears the burden of proving, proving to you by a preponderance of the evidence, that his conduct was due to decedent's wishes to forego medical care.

Let me explain the difference between the burdens of proof. While the Commonwealth's burden in relation to each element of each charge is beyond a reasonable doubt, the defendant's burden relating to

his affirmative defense is a lesser burden. That burden is a preponderance of the evidence, which means that the fact asserted is more likely true than not.

(N.T., 06/26/16, Vol. VIII, p. 1529, l. 22 – p. [1530, l. 9).

At Appellant's request, the jury was further instructed:

It is the law in the Commonwealth of Pennsylvania that a rational, competent person has a right to refuse medical treatment and they have a right to refuse it for any reason whatsoever. If you find based on the evidence presented that it is more likely than not that the decedent made a rational and competent refusal of medical care, you must find the defendant not guilty.

(N.T., 06/26/16, Vol. VIII, p. 1530, ll. 10-16).

COURT: [I]f you find by a preponderance of the evidence that it is more likely than not that the decedent made a competent, rational refusal of medical care, you may not find the defendant had a duty to care for the decedent.

See N.T., 06/29/16, Vol. VIII, p. 1541, ll. 4-7 (Third Degree Murder), p. 1543, ll. 2-6 (Involuntary Manslaughter), p. 1546, l. 5-9 (Aggravated Assault), and p. 1548, ll. 6-10 (Recklessly Endangering Another Person). We concluded that the instructions provided to the jury were necessary for them to understand the legal principles to be applied in the case given the evidence presented.

In order to aid the jury in their understanding of the law they were to consider, the instructions were displayed on a large screen so that they were able to read along as they listened to the court read the instructions. Additionally, each juror was provided

with a copy of the instructions for each of the offenses and the affirmative defense instruction to use for reference during their deliberations. After review of the entire jury instruction as reflected in the Notes of Testimony we continue to find our instructions were appropriate and find there was no error in giving the affirmative defense instruction in the manner in which it was given.[16]

## VIII.  Sentencing

Appellant claims we committed an error when imposing a "manifestly unreasonable" sentence of 5 to 10 years of incarceration for the crime of Murder in the Third Degree (18 Pa.C.S.A. §2502(c)). (Concise Statement, p. 2, par. 11). Appellant also claims that we erred in "applying the Sentencing Guidelines in an automatic fashion." *Id.* We do not find any error in sentencing Appellant to the legal, mitigated sentence of 5 to 10 years for Murder in the Third Degree.

"[T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion." *Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). Our Supreme Court has defined an abuse of discretion as being "more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.* (citation omitted). The sentencing court has broad discretion as it is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Id.*

---

[16] It should be noted that of the few questions asked by the jury during their approximately 10 hours of deliberations, none indicated there was any confusion relating to the differences between the burdens of proof they were to apply when making the finding of fact relating to the decedent's wishes, versus the finding of fact they were required to make relating to Appellant's legal duty to care for his father.

at 961–962.

Appellant does not question the legality of the sentence, but the discretionary aspect of the sentence as being "unreasonable" and "automatic". *Id.* This challenge to the trial court's discretion is not suitable for appellate review. *Commonwealth v. Wright*, 832 A.2d 1104, 1107 (Pa. Super. 2003); Commonwealth v. W.H.M. Jr., 932 A.2d 155, 164 (Pa. Super. 2007); *Commonwealth v. Zirkle*, 107 A.2d 127 (Pa.Super. 2014). Appellant must first show that there is a substantial question that the sentence imposed was not appropriate. We find that there is no substantial question. In fact, Appellant in his Concise Statement agrees the trial court sentenced Appellant within the mitigated range suggested by the Sentencing Guidelines.

Our appellate courts have held that it is the sentencing court that is in the best position to gauge the mitigating and aggravating factors and to "determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Perry*, 32 A.3d 232, 236 (Pa. 2011)(*quoting Walls*, supra at 926 (citations omitted). "Simply stated, … [we, as the sentencing court bring] an expertise, experience, and judgment that should not be lightly disturbed." *Commonwealth v. Pasture*, 107 A.3d 21, 27 (Pa. 2014), (*quoting Walls*, supra at 961)(citations omitted).

After careful consideration of the evidence presented at trial, we continue to find it was appropriate to sentence Appellant to 5 to 10 years of state incarceration for Murder in the Third Degree. We note that the Sentencing Guidelines suggest a minimum sentence of 6 years. We mitigated Appellant's sentence to 5 to 10 years. (N.T., 08/17/16, p. 6, l. 13- p. 7, l. 19). Accordingly, we find no abuse of discretion in the sentence imposed. *Commonwealth v. Perry*, 32 A.3d 232 (Pa. 2011) ("An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion.")

## CONCLUSION

It is our determination, for the reasons stated above, that no errors were committed at the time of trial or at the time of sentencing. We respectfully ask that the Superior Court AFFIRM our August 17, 2016 judgment of sentence imposing a 5 to 10 year sentence of incarceration for the crime of Murder in the Third Degree (18 Pa.C.S.A. §2502(c)).

BY THE COURT:

Ann Marie Wheatcraft            J.

Certified From The Record

This ___ 23 Day of ___ 20 16

Deputy Clerk of Common Pleas Court